MONTGOMERY CELLULAR HOLD-ING CO., INC., Palmer Wireless Holdings, Inc., and Price Communications Wireless, Inc., Respondents–Below, Appellants/Cross–Appellees,

v.

Gerhard Frank DOBLER, Chap Cell, Inc., Grace M. Kittrell, GTRW Partnership, Gary McKee, James E. Bryant, Lloyd E. Dawson, Gauld & Enschen Partnership, John Brown, Harold Swart and Essex County Cellular G.P., Petitioners Below, Appellees/Cross–Appellants.

No. 496,2004.

Supreme Court of Delaware.

Submitted: May 4, 2005.
Decided: Aug. 1, 2005.

Kenneth J. Nachbar (argued) and Samuel T. Hirzel, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Appellants/Cross–Appellees.

Martin S. Lessner (argued) and Dawn M. Jones, of Young Conaway Stargatt & Taylor, L.L.P., Wilmington, DE; Laura C. Mow and Thomas J. Dougherty, of Kilpatrick Stockton, L.L.P., Washington, DC, of counsel, for Appellees/Cross–Appellants.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

The appellants and respondents-below, Montgomery Cellular Holding Company ("MCHC"),[1] appeal from a judgment of the Court of Chancery in an appraisal proceeding brought under 8 Del. C. § 262. The appellees, who were the petitioners-below, are former minority stockholders of MCHC who were "cashed out" of MCHC at a price of $8,102.23 per share in a short form merger between MCHC and MCHC's majority stockholder, Palmer Wireless Holdings Inc. ("Palmer").[2] Dissatisfied with the price offered in the merger, the petitioners filed a Court of Chancery appraisal action. After a three-day trial, the Court of Chancery determined that MCHC's fair value was $19,621.74 per share.[3] MCHC has appealed from that appraisal award and from the Court's determined prejudgment interest rate. The petitioners have cross-appealed from the Court of Chancery's judgment insofar as it denies their claim for an award assessing their attorneys' fees and expert witness fees against MCHC.

Because we find MCHC's claims of error to be without merit, we affirm the Court of Chancery's valuation of MCHC and its selection of a flat prejudgment interest rate. We conclude, however, that the Court of Chancery's denial of the minority shareholders' application for an award of attorneys' fees and expert fees constituted, in the circumstances of this case, an abuse of discretion. Accordingly, we reverse the Court of Chancery's denial of an award shifting those fees and for that limited purpose, remand this case for further proceedings.

### FACTS

### The Parties

MCHC, the corporation that is the subject of this appraisal, was part of a complex holding company structure. MCHC itself was a holding company that had no operating assets, MCHC's sole asset being 100% of the stock of Montgomery Cellular Telephone Co. ("Montgomery"). Mont-

---

1. The respondents-below appellants are MCHC and its first and second tier parent companies, Palmer Wireless Holdings, Inc. and Price Communications Wireless, Inc. For purposes of this Opinion, except where otherwise noted, we refer to the respondents collectively as "MCHC."

2. The appellees are referred to in this Opinion as the "petitioners" or the "minority shareholders."

3. *Dobler v. Montgomery Cellular Holding Co., Inc.*, C.A. No. 19211, 2004 WL 2271592 at *1, n. 2 (Sept. 30, 2004) (hereinafter "Mem. Op.").

gomery was a cellular telephone system located in the area around Montgomery, Alabama. The Court and the parties based their valuations of MCHC on the value of its wholly owned subsidiary, Montgomery. Palmer Wireless Holdings, Inc. ("Palmer") was MCHC's majority (94.6%) shareholder. The petitioners, who were MCHC's minority shareholders, owned a 4.95% interest in MCHC. Besides MCHC, Palmer owned 15 other cellular systems located throughout the southeastern United States. Palmer is owned by Price Communications Wireless ("PCW"), which in turn is wholly owned by Price Communications Corporation ("Price").[4]

### Background

What follows is a capsule summary of the background facts, which are based upon the extensive findings made by the Court of Chancery in its well-written Opinion.

Palmer owned controlling interests in 16 cellular systems in Georgia, Florida, and Alabama, including a 94.6% interest in MCHC. Some of those systems were wholly owned and the rest were majority-owned. Eight of those cellular systems were Metropolitan Statistical Areas ("MSAs") and eight were Rural Service Areas ("RSAs"). The main difference between an MSA and an RSA is population density. An MSA has greater density, while an RSA is much more spread out. An MSA is generally more valuable, because an MSA usually has a higher penetration rate due to its demographics, such as residents with higher income and residents who are more conversant with wireless devices. Moreover, an MSA usually has a lower cost structure than an RSA because it does not need to build as many cell towers to serve the same number of users. Montgomery, which encompasses the area surrounding Alabama's state capital, was classified as an MSA.

As a group, Palmer's holdings formed a contiguous cluster of cellular systems in the southeastern United States. Montgomery, located on the western edge of Palmer's cluster, was at the center of the cellular systems in Alabama. That geographic location is important because the center of Alabama is a crucial area for any company that wants to provide substantial regional coverage, and Montgomery's system was located in Alabama's most populous area. The more populous areas commonly have both higher penetration rates and users that spend more per month for their cellular phone usage. For those reasons, Montgomery, and therefore MCHC, was one of Palmer's most valuable holdings.

In 1997, Price entered into discussions with various cellular telecommunications system operators about a possible sale of Palmer's cellular systems. Those discussions continued into 2000, at which time Price hired the investment bank, Donaldson, Lufkin & Jenrette ("DLJ"), to solicit interest in acquiring Palmer. DLJ's efforts resulted in three potential acquirers: Verizon and two other parties. Ultimately, Verizon was the potential acquirer with whom Palmer negotiated an acquisition.

After two months of due diligence, Verizon and Price negotiated a transaction agreement that was executed on November 14, 2000. In that transaction, Price agreed to sell Palmer to Verizon for $2.06 billion. The consummation of the transac-

---

4. For purposes of clarity, the Court of Chancery adopted in its Opinion a "simplified structure" of the holding companies. We adopt it as well. Under the simplified structure, Price is the ultimate parent company, Palmer is the regional systems holding company, MCHC is the holding company for Montgomery, and Montgomery is the operating cellular company whose value is at issue in this case.

tion, however, was conditioned on the prior completion of an initial public offering ("IPO") of Verizon Wireless.

Because Palmer did not control 100% of the stock of certain of its subsidiaries, including MCHC, the Verizon agreement also obligated Price to use commercially reasonable efforts to acquire those minority shareholder interests. If Palmer failed to acquire the minority interest in MCHC, the agreement allowed Verizon to reduce the purchase price by a corresponding amount. The price reduction would be computed by multiplying the minority shareholders' *pro rata* share of FY 2000 EBITDA[5] by 13.5. This reduction provision applied to the other non-wholly-owned Palmer subsidiaries as well. Thus, to receive the full $2.06 billion purchase price, Price would have to "squeeze out" all the minority shareholders of MCHC and its other non-wholly-owned subsidiaries.

The structure of the Verizon merger agreement gave Price a strong incentive to squeeze out all the minority shareholders of Palmer's subsidiaries at a price that was lower than Verizon's corresponding price reduction. Thus, any purchase of a minority position using an EBITDA multiple of less than 13.5 guaranteed more money for Price if the Verizon deal closed. Having no credible reason to expect the Verizon deal not to close, Price caused Palmer to go forward with the cash out mergers.

On June 30, 2001, Price caused Palmer, which owned more than 90% of the stock of MCHC, to eliminate the minority shareholder interest by a short form merger under 8 *Del. C.* § 253. In determining the price to be paid to MCHC's minority shareholders, Price made no effort to obtain an independent valuation, despite Verizon's repeated suggestions that it do so. When questioned about Price's reasons, Price's CFO testified that Price's CEO did not want to hire a financial advisor to perform a valuation because he viewed such valuations as "very costly." Instead, in fixing the MCHC merger price, Palmer purported to rely on Price's settlement of an appraisal action with the dissenting minority shareholders of a different Palmer subsidiary, Cellular Dynamics ("CD"). That "CD settlement" is next described.

CD, like MCHC, was the operator of a non-wireline cellular company in the southeastern United States and, like MCHC, was majority-owned by Price. In 1999, Price eliminated the minority shareholders of CD by a short form merger. Litigation ensued. After a lengthy negotiation using POPs[6] as the valuation tool, the minority shareholders agreed to a settlement based upon a value of CD derived by multiplying the estimated population by $470 per POP.[7]

Although Price had eliminated the minority shareholder interest in MCHC to

---

5. EBITDA is an acronym for earnings before interest, taxes, depreciation, and amortization.

6. "POP" is a shorthand reference to the census population of a specific geographic area. POPs are a common cellular industry metric for valuing cellular systems.

7. Despite overwhelming evidence that the CD settlement was negotiated using POPs and not EBITDA, Price claimed that it had valued CD's stock using an EBITDA multiplier of 10.05. Specifically, Price claimed that it mul-

tiplied MCHC's FY 2000 EBITDA by 10.05, to arrive at the $8,102.23 per share price that was offered to MCHC minority shareholders as fair value. In contrast, multiplying the $470 per POP metric by MCHC's POPs (323,-675) would have yielded a value of $15,212.74 per share. As noted elsewhere in our Opinion, the Vice Chancellor properly rejected MCHC's factual claim that the $8,102.33 per share merger price offered to MCHC's minority shareholders had been determined based on a multiple of EBITDA.

fulfill the Verizon agreement condition to Price's receiving the full agreed merger price, the initial Verizon deal was not consummated. One month after the MCHC squeeze-out, Price and Verizon announced a further delay of Verizon Wireless' IPO. That delay precluded Price and Verizon from completing their transaction. Later, Price and Verizon renegotiated the initial transaction, and signed a new agreement in which Verizon reduced its purchase price to $1.7 billion. That second transaction was agreed to on December 18, 2001 and was consummated on August 15, 2002.

### The Valuations Of The Trial Experts and The Decision Of The Court Of Chancery

During the three-day trial, the parties presented their respective positions through the testimony of their valuation experts.[8] The petitioners' expert, Marc Sherman, who was previously a partner of KPMG in charge of its corporate transaction practice, valued MCHC at $21,346 per share as of the merger date. The respondents' expert, Kenneth D. Gartrell, who was previously an accountant and auditor at Ernst & Young before becoming an independent consultant on fair market valuation matters, testified that the "stand-alone" value of MCHC as of the merger date was $7,840 per share.

Although both experts used similar methods to value MCHC, Sherman looked to third party experts to create his forecasts, whereas Gartrell did not consult outside appraisers or other sources of relevant information. Moreover, only Sherman performed a comparable transaction analysis. The experts' "significantly divergent" results, the Court of Chancery

found, were attributable to those two differences in approach.

### A. The Respondents' Expert Testimony

The respondents' expert, Gartrell, employed two valuation methodologies: a comparable company analysis and a discounted cash flow ("DCF") analysis. In his comparable company analysis, Gartrell focused on 14 rural and regional cellular companies. From that data set he derived revenue multiples of 3.5 for the rural companies and 3.3 for the regional companies, and he derived EBITDA multiples of 7.1 for the rural companies and 15.2 for the regional companies.

To eliminate the minority discount embedded in those multiples, Gartrell added a control premium of 35%, which was the mean of his range of control premia (30% to 40%). Applying that 35% premium, Gartrell increased the median revenue multiples from 3.5 to 4.0 for rural cellular carriers, and from 3.3 to 4.0 for regional carriers; and he increased the median EBITDA multiples from 7.1 to 8.4 for rural cellular companies and from 15.2 to 18.9 for regional companies.

Having generated revenue and EBITDA multiples, Gartrell proceeded to determine their "strategic weights," in order to "reflect[ ] the optimal mix of rural and regional business strategies" for MCHC. Gartrell arrived at strategic weights of 79% for rural values and 21% for regional values, which resulted in an initial valuation for MCHC of $122.7 million. Gartrell determined that valuation was too high, based on MCHC's "combinatorial deficiency," because (in Gartrell's view) cellular companies are "significantly more valuable in specific combinations" and Gartrell viewed

8. The parties stipulated that the minority stockholder petitioners had complied with the procedural requirements of Section 262. Accordingly, the principal issue remaining for the trial was the fair value of MCHC on the merger date.

MCHC as a "stand-alone" company. To account for MCHC's lack of "combinatorial value," Gartrell applied two discounts to the value he had derived for MCHC. He applied the first discount—33%—to account for MCHC's low combinatorial value relative to similar cellular companies. The second discount—15%—accounted for MCHC's complete lack of combinatorial value as a stand-alone entity. Gartrell derived both discounts from the "C–Block auction" that had been conducted by the Federal Communications Commission ("FCC") in 1996.[9]

Gartrell used the C–Block auction as a model for valuing MCHC because (in his judgment) MCHC should be valued as an isolated, single license entity, like the start-up PCS bidders at that auction. Applying Gartrell's total 48% combinatorial discount resulted in a "stand-alone" value for MCHC of $63.3 million. To that amount Gartrell then added the outstanding inter-company receivable, arriving at a final valuation, based on his comparable company analysis, of $80.5 million.

Gartrell also performed a DCF valuation of MCHC. Based on MCHC's financial performance for FY 2000 and its year-to-date performance as of June 30, 2001, Gartrell created his own forecasts of MCHC's future financials for a five-year period. He then adjusted those forecasts to subtract the bad debt expense that resulted from MCHC's installation of a new billing system. For his growth rate, Gartrell used the long-term GNP rate, which was 3.3%. Gartrell reasoned that the long-term GNP was the correct growth rate because MCHC had already saturated its market and therefore could not grow faster than the overall economy. Using those growth rates for his DCF analysis, Gartrell valued MCHC at $59.1 million, to which he added the $17.2 million inter-company receivable, to reach a final DCF valuation of $76.3 million.

Thus, Gartrell's comparable company analysis and his DCF analysis resulted in a valuation of MCHC that ranged from $76.3 million to $80.5 million—values both lower than the unilaterally set price that had been paid to the minority shareholders in the MCHC merger. Having no reason to differentiate between those two values, Gartrell averaged them to arrive at his final valuation for MCHC of $7,840 per share.

The Court of Chancery found that Gartrell's valuation approach was legally and factually flawed, and must be disregarded in its entirety, for three reasons. First, the Vice Chancellor found that Gartrell's overall theoretical framework was invalid as a matter of law, because Gartrell's "stand alone" approach valued MCHC as if it were not a going concern that had contractual relationships with other cellular providers. In fact, the Court found, MCHC had contractual relationships with Palmer and Palmer's larger preexisting networks, and those relationships represented value to which MCHC's minority stockholders were entitled. By valuing MCHC on a counterfactual "stand alone basis," the Court concluded, Gartrell "intended to deprive the minority stockholders of existing value as of June 30, 2001." [10]

---

**9.** The C–Block auction was a 1996 auction for part of the PCS spectrum, an unproven technology. Unlike earlier FCC auctions, the C–Block auction was restricted to new companies. To help encourage new bidders, the federal government provided financing for up to 90 percent of the successful bid price.

Despite the C–Block auction's reputation for success, the FCC awarded licenses to many "successful" bidders who would later be forced into bankruptcy due to their unserviceable debt loads.

**10.** Mem. Op. at *9.

Second, the Vice Chancellor found that Gartrell's DCF analysis was fatally flawed and entitled to no weight because: (i) Gartrell used a generic growth rate (the long-term growth rate of GNP) as his growth rate for MCHC without any valid, credible explanation and despite his having had access to industry-specific growth rates; (ii) Gartrell used a constant growth rate, which would yield the same value for MCHC regardless of the time frame; [11] and (iii) Gartrell created the financial projections based entirely on his own judgment, without reference to other available sources of relevant information. For these reasons, the Vice Chancellor determined, Gartrell's DCF analysis was "meaningless." [12]

Third, the Court of Chancery found that Gartrell's comparable company analysis was invalid because of his methodology and his data. To begin with, Gartrell switched between the mean and the median at critical points. To compute his EBITDA multiples, Gartrell used figures that were the median of their data set, but for every other computation he used the mean. Had Gartrell used the mean numbers consistently throughout, the value of MCHC based on EBITDA would be over $163 million which, when added to the non-operating assets, would be $183 million—a figure much closer to the value reached by the petitioners' expert.[13] Moreover, when calculating the correct weighting for the EBITDA ratio between rural and regional carriers, Gartrell applied a much higher weight (79%) to the rural companies than to the regional companies (21%). That (in the Court's words) was "simply not reali-

ty," because MCHC was an MSA and had the future potential of an MSA.[14] As the Vice Chancellor found, "the conclusion would appear inescapable that Gartrell established a pre-determined valuation figure to which he applied the EBITDA multiples." [15]

Lastly, Gartrell chose inputs (based on the C–Block auction) that were not relevant to a valuation of MCHC, because the C–Block auction suffered from "obvious and glaring" flaws which included outdated data, different technology, an emerging market and inexperienced bidders. The result, the Court found, was that the C–Block data "[could] not be termed comparable in any reasonable sense of the word." [16]

MCHC has not appealed the Court of Chancery's rejection, in its entirety, of the valuation of its expert, Gartrell.

### B. The Petitioners' Expert Testimony

The petitioners' expert, Marc Sherman, performed three different financial analyses of MCHC: a comparable transactions analysis, a DCF analysis, and a comparable company analysis. In his comparable transactions analysis, Sherman split the selected comparable transactions into three categories: similar sized transactions, the initial Verizon transaction, and the CD settlement. For the similar sized transactions category, Sherman considered five transactions that occurred between May 2000 and January 2001, each involving a cellular company with approximately the same number of POPs. The remaining

---

11. *Id.* at *10 ("In essence, [Gartrell's] DCF is nothing more than an extension of year one's financial results.")

12. *Id.*

13. *Id.*

14. *Id.* at *11, n. 98.

15. *Id.*

16. *Id.*

two categories (the initial Verizon transaction and the CD settlement) involved single transactions that were included in the analysis because they were related to the sale of MCHC.

Sherman then analyzed each category using his four cellular system metrics (POPs, subscribers, EBITDA, and revenue). For each metric, Sherman computed a value of MCHC based on the category of comparable transactions, and then weighted these values to derive his final overall valuation. Sherman did that as follows: he first weighted the metrics based on their importance in valuing cellular companies. He then weighted the category of comparable transactions within each metric. The result of that process is shown *infra* on the table, which breaks down Sherman's categories, metrics, valuations, and weightings as follows:

| Category | Valuation | Metric Weighting | Category Weighting |
|---|---|---|---|
| **POPs** | | 45% | |
| Verizon Transaction | $199,278,316 | | 20% |
| CD Settlement | $199,286,698 | | 10% |
| Similar Sized Transactions | $136,352,297 | | 15% |
| **Subscribers** | | 20% | |
| Verizon Transaction | $226,758,135 | | 15% |
| CD Settlement | $225,865,136 | | 5% |
| **Operating Cash Flows** | | 25% | |
| Verizon Transaction | $160,650,176 | | 20% |
| CD Settlement | $226,738,142 | | 5% |
| **Revenue** | | 10% | |
| Verizon Transaction | $236,517,971 | | 7% |
| CD Settlement | $224,240,681 | | 3% |
| **Total** | | 100% | 100% |

Multiplying the valuations by their respective weightings, Sherman computed a value of $192 million based on comparable transactions. To that figure he added the $20 million value of the non-operating assets to arrive at a comparable transactions value for MCHC of $212 million.

Sherman also performed a DCF analysis. Because of the lack of management projections, Sherman created forecasts of MCHC's cash flows based on predictions by others for the cellular industry and the economy. In creating those forecasts, Sherman relied primarily on Paul Kagan, an outside industry expert.[17] Sherman also looked to industry growth reports that showed an annual growth rate for the wireless industry of 16%.

The next step in Sherman's DCF analysis was to determine the discount rate using a weighted average cost of capital ("WACC") approach. Applying that approach to the inputs he determined for each component of the WACC formula, Sherman arrived at a discount rate of 13.25%.

17. As an example of the industry figures Sherman relied on, Kagan projected wireless subscriber growth of 23% in 2001, declining to 7.7% in 2005. Additionally, Kagan predicted an industry-wide market penetration of 78% by 2008.

For his DCF projection period, Sherman used a ten-year period from June 1, 2001 to May 31, 2011. Before projecting the cash flows, however, Sherman first adjusted them by removing two "irregularities": (i) a non-recurring $861,000 bad debt expense resulting from Montgomery having installed a new billing system, and (ii) the rent of $638,000 MCHC paid annually to Old North, a wholly owned subsidiary of Palmer.[18] Lastly, using a capitalization rate of 9.25% and a growth rate of 4%, Sherman calculated a terminal value of $258 million.

From these inputs, Sherman arrived at a final enterprise (DCF) valuation of $150 million for Montgomery as a going concern, operating asset of MCHC. To that figure Sherman added the value of Montgomery's non-operating assets, which increased his valuation to $170 million. Finally, to that sum, Sherman applied a control premium of 31%, thereby increasing his DCF valuation to $216 million.[19]

In his third (comparable company) analysis, Sherman found only two comparable companies, neither of which was similar in size to Montgomery. Sherman excluded companies that had international operations, multiple lines of business, or prepaid customers, as well as companies that used PCS technology. After selecting his comparable companies, Sherman applied the same metrics that he used in his comparable transactions analysis and gave them the same weight. That approach resulted in a valuation of $206 million. After adding in the value of the non-operating assets, Sherman's ultimate comparable company valuation of MCHC was $226 million.

Thus, Sherman's three analyses valued MCHC within a range of from $212 million to $226 million. Sherman derived his final fair value by combining the results of his three analyses into a weighted average, giving 80% weight to the comparable transactions value, 15% weight to the DCF value, and 5% weight to the comparable company value. Sherman's heavy weighting of the comparable transactions analysis reflected his judgment that the transaction data, particularly the initial Verizon transaction price, were the best indication of value for MCHC. In contrast, Sherman gave little weight to the DCF analysis because of his concerns about the reliability of MCHC's financial data and the lack of management projections. He gave even less weight to the comparable company valuation because of the scarcity of publicly traded companies to which MCHC could reliably be compared. Combining the results of the three analyses into a weighted average yielded a fair value for MCHC of $213,455,619, or $21,346 per share.

In making its independent determination of MCHC's fair value, the Court of Chancery adopted Sherman's overall valuation framework, and most—but not all—of Sherman's inputs. The Court made adjustments to some of the inputs that it did not adopt. The result was to reduce Sherman's valuation of $213,455,619 ($21,-346 per share) to a final valuation of

---

18. Montgomery sold all of its cell towers and cell sites to Old North for $1. Old North subsequently leased back the same properties to Montgomery at an annual rent of $638,000. Sherman removed that rental expense because it was a lopsided transaction that showed clear evidence of corporate control on the part of Price.

19. Sherman added a control premium to his DCF valuation to account for suspected financial irregularities that he could not specifically identify. Sherman was aware that Delaware courts generally do not apply control premia to DCF valuations, but he applied a control premium in this case to compensate for what he suspected were financial rents being improperly extracted from MCHC by Price.

MCHC of $196,217,373, or $19,621.74 per share [20]

Because the Vice Chancellor's valuation analysis is discussed more extensively elsewhere in this Opinion, at this point we summarize the Court's critical valuation rulings only briefly.

First, with respect to the comparable transaction analysis, the Vice Chancellor determined that the Verizon transaction price and the CD settlement price were valid inputs. But, the Court adjusted Sherman's CD settlement price by eliminating what Sherman perceived (incorrectly, the Court determined) to be a minority discount. The Court then independently increased the CD settlement figure ($470 per POP) by 15% to eliminate a so-called "settlement haircut," to arrive at a value of $540.50 per POP. [21]

Second, the Court adjusted Sherman's DCF valuation by eliminating the 31% control premium that Sherman had added to his DCF value. [22] That adjustment reduced Sherman's DCF valuation of MCHC from $216 million to $170 million. [23]

Third, and most significant, the Court adjusted the weights that Sherman had accorded to the values derived by his three valuation methods. Sherman had weighted the comparable transaction value at 80% of total fair value. Because the effect of that weighting was to give the Verizon transaction an overall weight of 50%—a weight the Court found to be "too significant"—the Vice Chancellor reduced the weight accorded to the comparable transactions valuation from 80 to 65%. [24]

Finally, because Sherman had corrected the figures derived from MCHC's financial statements in a reasonable manner, and also had looked to third party authority for guidance on other inputs, the Court determined that the 15% weight Sherman had accorded to the DCF valuation should be increased to 30%. [25]

### MCHC's Claims Of Error On Appeal

On appeal, MCHC does not challenge the Court of Chancery's adoption of Sherman's overall valuation framework. Instead, MCHC limits its attack to selected inputs to the valuation model that Sherman used and that the Vice Chancellor adopted. MCHC also challenges the prejudgment interest rate adopted by the Court.

Specifically, MCHC contends that the Court of Chancery erred in four different respects, namely by: (1) including in its comparable transactions analysis the price that Verizon Wireless initially agreed to pay to acquire Palmer; (2) adding a 15% premium to the price that the minority shareholders of CD, a separate Palmer subsidiary, had agreed to accept to settle their appraisal action; (3) subtracting the management fees that Palmer charged to MCHC, as reported in MCHC's financial statements; and (4) adopting a flat prejudgment interest rate rather than a variable rate that would have reflected the periodic changes in the federal discount rate. Those claims are next addressed.

### MCHC's Challenges To The Court Of Chancery's Factual Findings

MCHC's first three claims of error challenge the Court of Chancery's fac-

20. Mem. Op. at *8, *11, *18.

21. Id. at *15.

22. Id. at *17.

23. Id. at *7.

24. Id. at *17.

25. Id. The 5% weight that Sherman accorded to the comparable companies valuation (5%) remained the same.

tual findings pertaining to the proper treatment of three inputs to its valuation analysis. This Court reviews the Court of Chancery's factual findings with a high level of deference.[26] So long as the Court of Chancery has committed no legal error, its factual findings will not be set aside on appeal unless they are clearly wrong and the doing of justice requires their overturn.[27] We conclude, for the reasons next discussed, that none of the challenged findings is clearly wrong, and indeed, all have firm support in the evidentiary record.

### 1. The Verizon Transaction

MCHC's first claim of error is that the Court of Chancery improperly included the initial "Verizon transaction" price in its comparable transactions valuation of MCHC. The Verizon transaction resulted from an agreement that Price negotiated with Verizon in November 2000. In that agreement, Verizon contracted to acquire Palmer for $2.06 billion.

The accomplishment of the initial Verizon transaction was conditioned on the completion of an initial public offering ("IPO") of Verizon Wireless.[28] The Verizon–Palmer agreement also required Palmer to use "commercially reasonable efforts" to acquire all the minority shareholder interests in the 16 cellular markets that Palmer owned, including MCHC.[29] In conformity with that agreement, Palmer eliminated the minority shareholders' interest in MCHC and its other non-wholly-owned subsidiaries through short form mergers.

On July 31, 2001, one month after the MCHC–Palmer merger was accomplished but before the Verizon–Palmer transaction was scheduled to close, Price and Verizon announced that the Verizon transaction would not go forward as planned, because Verizon would not be able to complete its IPO by the contractual September 30, 2001 deadline. Following that announcement, Price and Verizon negotiated a new agreement wherein the purchase price of Palmer was reduced from $2.06 billion to $1.7 billion. On August 15, 2002, Verizon purchased Palmer for that reduced price.

The minority shareholders' expert, Marc Sherman, treated the initial $2.06 billion Verizon transaction as a comparable transaction. To determine what portion of that aggregate price should be attributed to MCHC, Sherman divided the total $2.06 billion purchase price by each of four financial metrics commonly used in valuing cellular systems, and then applied the resulting price per metric to MCHC's corresponding metrics to determine what

**26.** *Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110, 1114 (Del.1994); *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del.1993).

**27.** *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del. 1972); *Harris v. State,* 305 A.2d 318, 319 (Del.1973); *Cede & Co. v. Technicolor, Inc,* 2005 WL 1950280 (Del. May 4, 2005).

**28.** Section 9.07 of the Verizon agreement provided:

IPO. Subject to market conditions, [Verizon] will use all reasonable efforts to consummate an initial public offering of acquirer stock on or before September 30, 2001. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, [Verizon] shall not have any obligation to complete such an initial public offering if, in the judgment of [Verizon] ... market or other factors precludes such an offering or the restructuring contemplated in connection with such an offering on terms acceptable to [Verizon] and each partner of Cellco.

**29.** If Palmer failed to acquire the minority shareholder interest in its companies, the agreement allowed Verizon to reduce the purchase price of the transaction, by multiplying the minority shareholders' *pro rata* share of FY 2000 EBITDA.

portion of the purchase price for Palmer represented the value of MCHC. Although Sherman used other transactions besides the Verizon transaction to conduct his valuation analysis, he accorded the Verizon transaction the greatest weight (62%). In addition, Sherman gave his comparable transactions analysis the most weight (80%) of the three valuation methods he employed. As a consequence, the Verizon transaction price represented 50% of Sherman's ultimate valuation of MCHC. As earlier noted, the Court of Chancery adopted Sherman's methodology, but reduced the weight accorded to Sherman's comparable transactions value from 80% to 65%, thereby reducing the overall weight of the Verizon transaction to 40.3% of Sherman's ultimate fair value of MCHC.

On appeal MCHC argues that the Vice Chancellor's inclusion of the Verizon transaction in its comparable transactions analysis was erroneous, because: (a) the Court failed to "back out" the synergistic elements of the Verizon transaction price, as Delaware law requires, and (b) the Verizon transaction did not reflect MCHC's going concern value, again as Delaware appraisal law requires. We conclude that the Court of Chancery did not err in either respect.

### (a) The Treatment Of The Synergies In The Verizon Transaction

■■■■ MCHC argues that the Court of Chancery erroneously included the Verizon transaction, because the transaction price contained synergistic elements of value whose inclusion is proscribed by 8 *Del. C.*

§ 262. That statute requires the Court of Chancery to appraise the subject shares by "determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." [30] In determining statutory "fair value," the Court must value the appraisal company as a "going concern." [31] In performing its valuation, the Court of Chancery is free to consider the price actually derived from the sale of the company being valued, but only after the synergistic elements of value are excluded from that price.[32]

Those synergistic elements were not excluded here, MCHC claims, because the price Verizon agreed to pay for Palmer reflected the "combinatorial value" that Verizon expected to realize by acquiring 16 cellular markets (including MCHC) in a single transaction. MCHC argues that Palmer had unique strategic value to Verizon, because Verizon had a particular need to acquire cellular systems in the southeastern United States to fill the gaps in its national network. The cluster of systems that Verizon acquired, plus Palmer's unique strategic value to Verizon, were (MCHC urges) synergies that should have been excluded from the purchase price before the Verizon transaction could be considered in any valuation of MCHC. Because that was not done, the argument goes, the entire comparable transactions valuation was fatally flawed.

The Court of Chancery acknowledged in its Opinion that the initial Verizon transaction price represented a value "that implicitly incorporated whatever synergies [Veri-

---

**30.** 8 *Del. C.* § 262.

**31.** *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del.1996) ("'[T]he Court of Chancery's task in an appraisal proceeding is to value what has been taken from the shareholder, *i.e.*, the proportionate interest in the going concern.'").

**32.** *MPM Enter., Inc. v. Gilbert*, 731 A.2d 790, 796 (Del.1999); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Group, Ltd.*, 847 A.2d 340, 356 (Del.Ch.2003).

zon] expected to realize from creating a national network."[33] The Court found, however, that the only "combinatorial value" that was attributable to Palmer was "deal-making value." That is, by offering a cluster of 16 cellular systems for sale at one time, Palmer would be reducing Verizon's transaction costs and eliminating "a holdout problem."[34] But, the Court found, Palmer offered *no business-related* combinatorial value to MCHC, and MCHC was probably the most valuable company in Palmer's cluster.[35] Thus, the Vice Chancellor concluded, the only synergies included in the purchase price were deal-making—not business-related—synergies.

That conclusion is supported by the evidence. The Verizon merger with Palmer did not add any synergistic business value to MCHC (as the Court found) because Montgomery was a metropolitan statistical area (MSA), which is generally more valuable than a rural service area (RSA), and Montgomery had superior demographics relative to Palmer's other cellular holdings.[36] Therefore, the only synergies required to be eliminated from the Verizon transaction price were the Palmer-related "deal making" synergies. The question became how to determine the value of those synergies.

▮ The Court of Chancery was unable precisely to quantify those "deal-making"

synergies, because MCHC did not present any reliable evidence at trial of what those synergies were worth. Having received no helpful evidence from MCHC, the Court of Chancery had to—and did—account for the synergies in a different way, namely, by reducing the total weight accorded to the comparable transactions component of the overall valuation, from 80% to 65%.[37] Although in a perfect world that may not have been the ideal solution, in this world it was the only one permitted by the record evidence, given MCHC's failure to obtain a pre-merger valuation and to present legally reliable expert valuation testimony during the trial.

▮ In a statutory appraisal proceeding, each side has the burden of proving its respective valuation positions by a preponderance of the evidence.[38] Even if one side fails to satisfy its burden, the Court is not free to accept the competing valuation by default, but must use its own independent judgment to determine fair value.[39] Having failed to present any reliable evidence to enable the Court of Chancery to carry out "its statutory obligation to engage in an independent valuation exercise,"[40] MCHC cannot now credibly argue that the Court erred by resorting to a valuation approach necessitated by MCHC's own failure. Given the paucity of synergy-related evidence for which MCHC

33. Mem. Op., 2004 WL 2271592 at *12–*13.

34. *Id.* at *14.

35. *Id.*

36. Montgomery ranked second among Palmer's holdings in terms of POPs (the census population of a geographic area) and was generally best or second best in the other demographic categories. Mem. Op. at *2, n. 6. The Court rejected MCHC's argument that Montgomery was a "sick sister" among Palmer's holdings. MCHC's argument to that affect relied upon Montgomery's EBITDA,

which the Court found had purposely been driven down by Price. *Id.* at *14. This Court defers to the Court of Chancery's factual findings because the evidentiary record amply supports them.

37. Mem. Op. at *17.

38. *M.G. Bancorporation v. LeBeau,* 737 A.2d 513, 520 (Del.1999).

39. *Gonsalves v. Straight Arrow Publishers, Inc.,* 701 A.2d 357, 362 (Del.1997).

40. *Id.*

was responsible, the Vice Chancellor coped admirably with the evidence that was presented, and reached a reasonable valuation using the analytical tools and evidence that were available to him.

In our most recent decision in *Cede & Co. v. Technicolor, Inc.*,[41] we reaffirmed that our deferential standard of review in corporate appraisal cases is "based on a recognition 'that the Court of Chancery, over time, has developed an expertise' in statutory appraisal proceedings."[42] Where, as here, a controlling stockholder has provided no reliable evidence, either pre-merger or during the trial, to enable the Court of Chancery to perform its mandated task, the Court may rely upon its expertise and upon whatever evidence is presented to determine fair value independently. In this case, the Court was free to use whatever methodology was supportable by the record to reach a valuation result that excluded, to the extent reasonably possible, the synergies implicit in the comparable transaction being considered. The Court's chosen method of eliminating the deal-making synergies from the Verizon transaction price represented a reasonable application of its expertise to the evidence available, and is entitled to deference from this Court.

### (b) Whether Including The Verizon Transaction Price Was Inconsistent With a Going Concern Valuation

MCHC next contends that including the Verizon transaction in its comparable transaction analysis led the Court of Chancery to commit reversible error by not valuing MCHC as a going concern. Delaware law requires that in an appraisal action, a corporation "must be valued as a going concern based on the 'operative reality' of the company as of the time of the merger."[43] In determining a corporation's "operative reality," the use of "speculative" elements of future value arising from the expectation or accomplishment of a merger is proscribed, but elements of future value that are known or susceptible of proof as of the date of the merger may be considered.[44] As we have held, "any ... facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered by the agency fixing the value."[45]

MCHC argues that the Verizon transaction was not part of MCHC's "operative reality" for two reasons. First, the transaction was conditioned on the successful completion of Verizon's IPO. Second, at the time of the MCHC–Palmer merger, the transaction was not expected to close. MCHC characterizes the Verizon transaction as a mere "option" whose exercise was entirely within Verizon's control and which neither Price nor Verizon realistically expected to close at the time the MCHC–Palmer merger occurred. The Court of Chancery found otherwise, however, and the record supports its finding.

---

41. *Cede & Co. v. Technicolor, Inc.*, No. 357, 2004, 2005 WL 1950280 (Del. May 4, 2005).

42. *Id.* at *5.

43. *M.G. Bancorporation, Inc.*, 737 A.2d at 525.

44. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del.1983); 8 *Del. C.* § 262(h).

45. *Tri–Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del.1950), quoted with approval in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983). See also *Cede Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del.1996).

The Vice Chancellor rejected MCHC's argument that because the Verizon–Price agreement was conditional, it was impermissibly "speculative" and did not reflect MCHC's going concern value. The Court of Chancery found that the Verizon transaction was more than an offer (or an "option" as MCHC argues). Rather, it was a validly executed enforceable transaction agreement which bound Verizon to the implied covenant of good faith and fair dealing that inheres in every contract.[46] Moreover, Section 9.07 of the Verizon–Price agreement required Verizon to use "reasonable efforts" to consummate the IPO, and excused Verizon from a failure to do so only if market or other identified factors precluded the offering or the necessary restructuring.[47]

Rejecting MCHC's contrary argument, the Vice Chancellor also found as fact that at the time of the Palmer–MCHC merger the Verizon transaction *was* expected to close. As the Court pointed out, there were no contemporaneous press releases or other communications to the market that Price or Verizon did not expect the deal to go through. And, at that time the securities industry continued to report that the deal was going forward as planned. Not until July 31, 2001 (one month after the Palmer–MCHC merger took place) did the parties publicly announce that the sale of Palmer to Verizon would not close. The Court characterized as "self-serving" the testimony of Price's CFO, and of its counsel, that at the time of the MCHC merger, Palmer and Price did not think Verizon would successfully complete the IPO. To the contrary (as the Court pointed out),

the fact that Price caused Palmer to initiate a cash-out merger with MCHC was clear proof that Price did expect the Verizon deal to close.

Given that record and those findings, the Court of Chancery correctly held that the Verizon transaction was a known element of future value that was susceptible of proof at the time of the merger.[48]

2. **Adjustment Of The CD Settlement Price To Eliminate The Settlement Discount**

■ MCHC's second claim of error is that the Court of Chancery improperly adjusted the "CD settlement" price to eliminate what the Court regarded as a "settlement haircut." MCHC argues that the record does not support that adjustment. MCHC is incorrect.

The CD settlement was a settlement of litigation that arose out of Price's elimination, in a short form merger, of the minority shareholders of Cellular Dynamics ("CD"), a cellular company located in the southeastern United States. The minority shareholders of CD sued, and after protracted negotiations the parties agreed to a settlement price of $470 per POP. For purposes of valuing MCHC, both parties agreed that the CD settlement was a comparable transaction. Accordingly, Sherman utilized the $470 per POP metric in performing his comparable transactions analysis.

The Vice Chancellor upheld Sherman's use of the CD settlement price, but adjusted that price to reflect what the Court described as a "settlement haircut;"[49] that

46. Mem. Op. at *14.

47. See note 28, *supra.*

48. Cede & Co. v. Technicolor, Inc., 684 A.2d at 298 ("The Court of Chancery found that the

Perelman Plan for Technicolor was the operative reality on the date of the merger.")

49. The Court also held that Sherman had incorrectly adjusted the CD settlement to remove a perceived minority discount. The settlement price could not properly reflect such

is, a discount that reflected factors unrelated to CD's fair value, such as the costs of litigation and the uncertainty of the appraisal action's outcome. To eliminate that settlement discount, the Court of Chancery increased the CD settlement price by 15%, thereby reaching a value of $540.50 per POP as more fairly reflective of the value of CD. The Court then included that upwardly-adjusted CD settlement value in the comparable transactions analysis.

On appeal, MCHC contends that there was no evidence of record that the CD settlement reflected a "settlement haircut," or that the selection of a 15% adjustment was appropriate. We disagree. There was ample evidence to support the Court of Chancery's finding that the CD settlement reflected a discount from CD's fair value. The record included an exchange of several letters between Price and CD during settlement negotiations. Those letters included an offer by CD, on December 19, 2000, to settle the litigation for $500 per POP. In that December 19 letter, the CD minority shareholders specifically stated that the $500 per POP offer was less than CD's fair value, but was being made in an effort to resolve the matter quickly. That letter evidences that CD's minority shareholders were willing to settle for an amount below fair value to avoid the costs and delays of litigation. Sherman's testimony also supports that conclusion. Sherman testified that CD's minority shareholders would be expected to take less for their shares of stock than the corporation's going concern value, to

avoid "the continuing expense and risk of litigation." The December 19 letter, together with Sherman's testimony, provided sufficient support for the Court's finding that $470 per POP represented a settlement for less than CD's going concern value.

Although there was no evidence of the precise magnitude of the actual CD settlement discount, the Court of Chancery did not err by selecting 15% as a reasonable measure. That percentage was based on evidence that the CD minority shareholders had accepted a price lower than CD's fair value, as well as the Court of Chancery's extensive expertise in the appraisal of corporate enterprises—an expertise that this Court has recognized on several occasions.[50] To reiterate, where, as here, one side of the litigation presents no competent evidence to aid the Court in discharging its duty to make an independent valuation, we will defer to the Vice Chancellor's valuation approach unless it is manifestly unreasonable, i.e., on its face is outside a range of reasonable values.[51] Here, the record supports the conclusion that the use of a 15% adjustment was reasonable and a judicious application of the Vice Chancellor's valuation expertise.

### 3. Eliminating The Management Fees Paid by MCHC To Palmer As An Input To The DCF Valuation

MCHC's third claim of error challenges the Court of Chancery's adjustment of MCHC's financial statements to eliminate from the DCF valuation the management fees Palmer had charged MCHC.

---

a discount, because Georgia law (CD's state of incorporation) did not allow minority discounts. Accordingly, the Court removed the control premium that Sherman had added to adjust for the (perceived) minority discount. Mem. Op. at *15.

**50.** *Cede & Co. v. Technicolor, Inc.*, No. 357, 2004, 2005 WL 1950280 at *5 (Del. May 4, 2005) (citing *In re Appraisal of Shell Oil Co.*, 607 A.2d 1213, 1219 (Del.1992)).

**51.** Cf. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 45–46 (Del. 1994).

The Court found that those fees were essentially a pretext, unrelated to the actual furnishing of management services, that Price used to justify upstreaming money from MCHC to Palmer. The Vice Chancellor upheld Sherman's elimination of those fees from MCHC's financial statements for purposes of conducting his DCF valuation. On appeal, MCHC contends that the elimination of those fees was not supported by the evidence. The record, however, shows otherwise.

Because there were no management projections upon which Sherman could rely to project MCHC's future cash flows, Sherman had to create his own forecasts. To do that he relied upon various sources, including MCHC's financial statements.[52] But Sherman did not accept MCHC's financial statements at face value. In his review of those statements, he identified several irregularities.[53] The management fees that Palmer charged to MCHC represented one of those irregularities. The evidence established that since 1998, Palmer had charged MCHC more than $3 million in management fees, and that in the first five months of 2001 alone, those fees totaled $603,000. To determine MCHC's future cash flows more accurately, Sherman eliminated those fees.

The Court of Chancery found that Sherman's subtraction of the management fees was appropriate, and the record amply supports that finding. None of Price's officers who testified were able to explain what management services Palmer had provided to MCHC, or how those management fees were calculated. Indeed, Price's CEO characterized the fees (under oath) as "accounting bullshit." The Court was also troubled by the fact that Palmer charged management fees only to its subsidiaries that had minority shareholders, but not to those subsidiaries that Palmer wholly owned. Tellingly, after Palmer eliminated MCHC's minority shareholders in the merger, Palmer stopped charging management fees to MCHC.

That evidence strongly supports the elimination of the management fees as an expense. Accordingly, we uphold the Court's determination that Sherman properly eliminated those management fees in conducting his DCF valuation analysis.

### The Adoption Of a Flat Prejudgment Interest Rate

■ Finally, MCHC claims that the Court of Chancery erred by setting the prejudgment interest rate at a flat 8.25%. That rate represented the legal rate of interest, which is defined by 6 *Del. C.* § 2301(a) as the federal discount rate plus 5%. MCHC does not dispute the Court's adoption of the legal rate of interest. What MCHC contends is that the Court was required to adjust that rate to reflect the periodic changes to the federal discount rate.

---

52. Sherman relied, in addition to the financial statements, upon the predictions of an industry expert who provided industry growth forecasts, including subscriber growth, market penetration, and annual growth. Sherman also considered the predictions of Verizon's internal consultant.

53. In addition to the management fees, Sherman also identified, and adjusted MCHC's financial statements to account for: an unexplained $16.6 million inter-company loan from Montgomery to Palmer; corporate allocations for interconnection charges, switch charges, monthly service charges, and billing charges, which Palmer could not explain or document; an $861,000 bad debt expense; and a vendor overcharge. The Court of Chancery found that all of those adjustments were appropriate. See Mem. Op. at *16–17, n. 140–43. Aside from the elimination of the management fees, none of those adjustments are challenged on appeal.

8 *Del. C.* § 262(h) directs the Court of Chancery to determine the fair value of a stockholder's shares, "together with a fair rate of interest, if any." Although the legal rate has historically been considered as the "benchmark" for pre-judgment interest, the Court of Chancery has broad discretion to determine the appropriate rate of interest, and may award a different rate.[54] The decision to award a particular rate of interest is within the sound discretion of the Court of Chancery.[55] Accordingly, we review the Vice Chancellor's determination of the interest rate for abuse of discretion.

MCHC argued before the Court of Chancery that the appropriate rate of interest was the legal rate. The Court accepted MCHC's argument. MCHC did not argue that the legal rate should track the historical variations in the federal reserve discount rate during the prejudgment interest period. Thus, the Court adopted a flat rate of 8.25%, based on the 3.25% federal discount rate on the merger date. Although the Court noted that it would be more accurate to adopt a varying rate that reflected changes to the federal discount rate over the course of the litigation, the Vice Chancellor adopted the flat rate in this case, because MCHC had presented no evidence of any changes in the federal discount rate.

Despite that, MCHC now argues that the Court of Chancery erred by not adjusting the 8.25% legal rate at "regular intervals" to reflect changes in the federal discount rate between the merger date and the date of final judgment. MCHC did not present that argument to the Court of Chancery during post-trial briefing, however, nor did it introduce evidence of any federal reserve discount rate other than 3.25%. In essence, MCHC contends that the Court of Chancery should have, *sua sponte*, taken judicial notice of the changes in that discount rate, because those rates are published and readily available in an online database.

This argument fails for two reasons. First, this Court will not entertain a claim or argument that was not fairly presented to the trial court.[56] Second, the "interests of justice" exception to that rule does not apply so as to require us to resolve MCHC's belated claim.[57] The rules of evidence require a court to take judicial notice of facts only if the court is "requested by a party and supplied with the necessary information."[58] Otherwise, the Court has discretion to decide whether or not to take judicial notice of certain facts.[59] Here, MCHC neither provided the necessary information nor requested that the Court take judicial notice. Absent any such request, the Court quite properly relied on MCHC's position and the evidence before it, and set the only interest rate that was supported by that evidence: a flat rate. In the circumstances, it was not an abuse of discretion for the Vice Chancellor to do that. We therefore uphold the Court's prejudgment interest rate determination.

**54.** *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 409 (Del.1988).

**55.** *In re Shell Oil Co.,* 607 A.2d 1213, 1221 (Del.1992); *Rapid–American Corp. v. Harris,* 603 A.2d 796, 807 (Del.1992).

**56.** Del.Supr. Ct. R. 8. ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question so presented.")

**57.** *Id.*

**58.** Del. R. Evid. 201(d).

**59.** Del. R. Evid. 201(c).

### The Minority Shareholders' Cross–Appeal

On their cross-appeal, the minority shareholder petitioners claim that the Court of Chancery erred by refusing to award their attorneys' fees and expert witness fees against MCHC. They contend that the Court of Chancery's own findings establish bad faith on the part of MCHC sufficiently egregious to justify fee-shifting, and that the Court of Chancery's denial of a fee-shifting award in this circumstances constituted an abuse of discretion.

The Court of Chancery rejected the minority shareholders' application for a fee-shifting award because, in the Court's view, MCHC's conduct was not sufficiently egregious to justify fee-shifting.[60] To be sure, the Court did express concern about MCHC's (and Palmer's) behavior in carrying out the merger and in defending the litigation. The Court noted that the respondents did not obtain a financial advisor to assist them in setting a fair merger price or otherwise secure an independent valuation of MCHC, and that Price's CEO had unilaterally set the merger price without regard for MCHC's fair value.[61] The Court was also troubled by MCHC's disposal of the company's computers in the face of both a clear discovery request from the minority shareholders and a court order compelling MCHC to produce those computers. The Court further found that there was "credible evidence" that Price's CEO had repeatedly lied under oath.[62] Despite those findings, the Court held that the petitioners had "failed to demonstrate the glaring egregiousness that would compel [the Court] to award fees and costs."[63] This Court reviews the award or denial of attorneys' fees under exceptions to the American Rule for abuse of discretion.[64]

Delaware follows the "American Rule," whereby a prevailing party is generally expected to pay its own attorney's fees and costs.[65] This Court has recognized limited equitable exceptions to that rule, including the exception for "bad faith" conduct during the litigation. Although there is no single, comprehensive definition of "bad faith" that will justify a fee-shifting award, Delaware courts have previously awarded attorneys' fees where (for example) "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[66] The bad faith exception is applied in "extraordinary circumstances" as a tool to deter abusive litigation and to protect the integrity of the judicial process.[67]

In this case, the Court of Chancery's factual findings, all firmly supported by the record, compel the conclusion that MCHC's conduct during the cash-out merger and during the course of the appraisal proceeding rose to the level of bad faith that both this Court and the Court of Chancery have found justifies an award of attorneys' fees. In *Johnston v. Arbitrium (Cayman Is.) Handels AG*,[68] this Court held that a fee-shifting award of attorneys' fees was appropriate under the bad faith exception, because the defendants had: (i)

60. Mem. Op. at *20.

61. *Id.* at *19.

62. *Id.*

63. *Id.* at *20.

64. *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del.1998).

65. *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1043 (Del.1996).

66. *Johnston*, 720 A.2d at 546 (internal citations omitted).

67. *Id.*

68. 720 A.2d 542 (Del.1998).

defended the action despite their knowledge that they had no valid defense, (ii) delayed the litigation and asserted frivolous motions, and (iii) falsified evidence, and (iv) changed their testimony to suit their needs.[69] Similarly, in *RGC International Investors v. Greka Energy Corp.*,[70] the Court of Chancery awarded attorneys' fees against the defendant under the bad faith exception, because the defendant had forced the plaintiff to engage in litigation that would not have been necessary if the defendants had acted with even minimal responsibility; and because the multiple theories advanced by the defense had "minimal grounding in fact and law" and made the litigation more expensive than it should have been.[71] And, in *Kaung v. Cole National Corp.*,[72] this Court recently upheld the application of the bad faith exception to the American Rule where the plaintiff had an improper motive for filing the action, the plaintiff's attorneys had made excessive and duplicative discovery requests while ignoring their own client's discovery obligations, and one of the plaintiff's key witnesses had refused to answer any questions during his deposition.[73]

 When juxtaposed against the conduct found to constitute bad faith under those precedents, MCHC's conduct must similarly be regarded as demonstrative of bad faith. The Court of Chancery found that Price's CEO, Robert Price, set the merger price unilaterally, after ignoring repeated suggestions from Verizon that he hire an independent financial advisor. The resulting unfairly low price, which was not based on any legitimate valuation of MCHC, forced the minority shareholders to initiate an appraisal action—their only remedy in a short form merger.[74] Although the bad faith exception does not apply to the conduct that gives rise to the substantive appraisal claim in a short form merger, evidence of a party's prelitigation conduct can be relevant to show the motive or intent driving that party's conduct during that appraisal litigation.[75] Here, Price's failure reasonably to ascertain MCHC's fair value before setting the merger price was a motive for Price later to lie under oath and to allow the destruction of documents to obstruct the petitioners' efforts to uncover evidence of MCHC's true value—evidence that was essential to enforcing the only remedy that was available to the petitioners.

MCHC's conduct during the litigation also interfered with the Court's performance of its duty to determine the fair value of the company, and unnecessarily prolonged and increased the costs of the litigation. MCHC repeatedly refused to produce documents that had been requested in discovery. The most egregious instance involved the minority shareholders' request for the production of documents—including computers—relating to allocations and intercompany loans between the respondent entities. MCHC refused to produce those documents until the Court of Chancery ordered them to do so nine months after the initial document request. Even after that order was issued, MCHC could not produce most of the information requested because MCHC had destroyed

69. *Johnston,* 720 A.2d at 546.

70. C.A. No. 17674, 2001 WL 984689 (Del.Ch. Aug. 22, 2001).

71. *Id.* at *19.

72. C.A. No. 480, 2004, 2005 WL 1635200 (Del. July 5, 2005).

73. *Id.* at *5.

74. *Glassman v. Unocal Exploration Corp.,* 777 A.2d 242 (Del.2001).

75. *Id.; see also Johnston,* 720 A.2d at 546.

the computers where the information was stored. MCHC admitted that it destroyed the computers *after* the Court of Chancery had ordered their production.

Additionally, the Court of Chancery found that Robert Price, the CEO of Price and MCHC, had lied under oath about the valuation method he had used to determine the merger price, claiming—in the face of overwhelming evidence to the contrary— that the merger price was based on the CD settlement's EBITDA multiplier.[76] Price also appears to have testified falsely about his involvement in the CD settlement, contending that he had no knowledge or involvement in that settlement, even though he had signed the settlement agreements.

Finally, MCHC introduced, and relied upon, expert valuation testimony that the Court found was "fatally flawed" in both its methodology and its data. The Court was forced to reject completely the valuation testimony of MCHC's expert, Gartrell, because the Vice Chancellor found that testimony was not credible and was designed "to deprive the minority shareholders of the existing value" in the company.[77] The Court found that Gartrell had created his own projections for the DCF analysis without consulting any outside source,[78] that Gartrell had never analyzed MCHC's business operations, and that he had no idea what MCHC's business strategy was. The Court rejected Gartrell's comparable company analysis because he had selectively used different methodologies, and had

chosen inputs that were not relevant to MCHC's fair value.[79] Ultimately, the problems in Gartrell's analysis led the Court to conclude that Gartrell had "established a predetermined valuation figure," and developed his expert testimony to fit into that figure.[80]

Given the overwhelming evidence that the respondents repeatedly acted in bad faith to obstruct if not prevent a fair valuation of MCHC, we are constrained to conclude that the Court of Chancery abused its discretion by declining to award attorneys' and expert witness fees in favor of the minority shareholders and against the respondents. We therefore reverse the Court's judgment in that limited respect, and remand this case for a determination of the minority shareholders' reasonable attorneys' fees and expert witness fees.

### *Conclusion*

For the foregoing reasons, the judgment of the Court of Chancery is affirmed in part, reversed in part, and remanded for proceedings consistent with the rulings in this Opinion.

---

**76.** During his testimony, Price claimed that the CD settlement was based on an EBITDA multiplier of 10.05, despite clear evidence that the settlement was derived by multiplying CD's estimated population (POP) by $470. Despite that evidence, Price testified that he multiplied MCHC's EBITDA by 10.05, and thereby reached the merger price of $8,102.23 per share. The Court of Chancery found that this testimony was false, and re-

jected Price's testimony as self-serving. Mem. Op. at *3.

**77.** Mem. Op. at *9.

**78.** *Id.* at *10.

**79.** *Id.* at *10–*11.

**80.** *Id.* at *11.