# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ZAGG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1275-KSJM |
| | ) | |
| DERMOT KEOGH and RFA BRANDS, | ) | |
| LLC d/b/a MYCHARGE, | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: February 21, 2025
Date Decided: April 7, 2025

Stephen E. Jenkins, Samuel M. Gross, ASHBY & GEDDES, P.A., Wilmington, Delaware; Jeffrey B. Korn, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Counsel for Plaintiff ZAGG, Inc.*

Thomas A. Uebler, Sarah P. Kaboly, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Counsel for Defendant Dermot Keogh.*

**McCORMICK, C.**

After working for ZAGG, Inc. for twelve years, Dermot Keogh left in November 2023. He went to work for myCharge, which makes products that compete with ZAGG's products. ZAGG brought this litigation against Keogh and myCharge, claiming that Keogh's employment with myCharge breached non-compete, non-interference, non-disparagement, and confidentiality provisions of a restrictive covenant agreement. MyCharge then fired Keogh, and ZAGG dismissed myCharge from this lawsuit. Keogh denied ZAGG's allegations but decided that litigation was not worth it. He turned over documents to ZAGG that he found on his home computer and waited out the restrictive period, which was one year. This litigation went into a holding pattern. The restrictive covenant period expired. Two days later, Keogh accepted work for another ZAGG competitor, PanzerGlass. ZAGG then sprung back to life, threatened to sue PanzerGlass as it had myCharge, and argued that Keogh's restrictive covenants were tolled during this litigation. PanzerGlass fired Keogh. A surprised and understandably frustrated Keogh asked for a prompt trial on the merits, which the court granted. This post-trial decision finds in favor of Keogh on all claims asserted by ZAGG.

I.    FACTUAL BACKGROUND

The record comprises 161 joint trial exhibits, trial testimony from three fact witnesses, deposition testimony from three fact witnesses, and 27 stipulations of fact in the pre-trial order.[1] These are the facts as the court finds them after trial.

---

[1] This decision cites to: C.A. No. 2023-1275-KSJM docket entries by docket ("Dkt.") number; the trial exhibits (Dkt. 82) (cited by "JX" number); the trial transcript by page and line numbers (Dkt. 92) (cited as "Trial Tr."); the transcripts of the depositions of Dermot Keogh, Daniel Allen, and Daniel Allred (Dkt. 80) (by the

## A. Keogh's Employment History At ZAGG

ZAGG, Inc. ("ZAGG" or the "Company") is a Delaware corporation based in Utah that operates in the mobile accessories and technologies market.[2] ZAGG hired Dermot Keogh in May 2011. Keogh is an Irish citizen, and he was initially employed at ZAGG's Irish offices.[3] He first worked as a social media manager, and later assumed roles as product manager for ZAGG's audio and screen protection products,[4] and power bank products.[5]

ZAGG moved Keogh and his family to the United States in 2017, where Keogh was a senior product manager for ZAGG's main screen protection product.[6]

ZAGG promoted Keogh in 2023 to Associate Vice President of Product Protection. He continued to focus on ZAGG's screen protection and case product lines.[7] Keogh's responsibilities included price negotiation, innovation, factory management, delivery, customer relationships, and ZAGG's program with partners

---

deponent's last name and "Dep. Tr."); and the Parties' Joint Pre-Trial Order (Dkt. 74) ("PTO").

[2] PTO ¶¶ 4–5.

[3] Trial Tr. at 5:1–6:2 (Keogh); PTO ¶ 7.

[4] Trial Tr. at 5:22–23, 7:4–9 (Keogh).

[5] *Id.* at 6:8–13, 7:10–19, 8:19–23 (Keogh).

[6] *Id.* at 7:20–8:11 (Keogh).

[7] *Id.* at 9:13–17 (Keogh); PTO ¶ 8.

such as Samsung, Motorola, and Google.[8]  At this time, Keogh's manager was Patrick Keenan, a Senior Vice President.  Keenan was on the executive team; Keogh was not.[9]

## B.     The Restrictive Covenant Agreement

In connection with Keogh's 2023 promotion, Keogh signed a restrictive covenant agreement (the "Restrictive Covenant Agreement").[10]  In exchange for entering the agreement, Keogh received a pay increase, a title increase, and a $100,000 retention bonus if he stayed at ZAGG through 2025.[11]  The Restrictive Covenant Agreement prevents Keogh from engaging in "Competitive Activities" and "Interfering Activities," disparaging ZAGG, and misusing ZAGG's confidential information.[12]  The relevant text of the Restrictive Covenant Agreement is quoted and discussed in the legal analysis.

## C.     ZAGG Denies Keogh A Promotion.

In August 2023, Keogh applied for a Head of Product Development role at ZAGG.[13]  Although ZAGG's human resources department received Keogh's application,[14] his application was not seriously considered.[15]  ZAGG's Vice President

---

[8] Trial Tr. at 9:18–10:6 (Keogh).

[9] *Id.* at 10:7–12 (Keogh).

[10] *Id.* at 12:18–20 (Keogh); JX-25 ("Restrictive Covenant Agr.").

[11] Trial Tr. at 13:7–14 (Keogh); PTO ¶ 9.  Keogh entered into restrictive covenant agreements when he first started working for ZAGG in 2011 and when ZAGG moved him to the United States.  Trial Tr. at 12:9–17 (Keogh).

[12] Restrictive Covenant Agr. §§ 1, 3, 6.

[13] Trial Tr. at 11:2–13, 47:9–19 (Keogh).

[14] JX-29.

[15] Trial Tr. at 48:8–11 (Keogh); *id.* at 204:14–205:9 (Allred).

of Human Resources, Daniel Allred, testified that he had a group of new recruiters that stopped reviewing applications because there were several candidates far along in the application process.[16] Allred was unaware of Keogh's application for weeks until Keogh reached out to inquire about the status of hiring the position.[17]

Keogh was unhappy about ZAGG's response to his application[18] and began looking for alternative employment. The same day that Keogh messaged Allred about the Head of Product Development position, he texted his wife Jodee that he sent Tim Smart a message and that he would "go" if Tim gave him "$250k, 25% Bonus, 5% 401k match and indemnification[.]"[19] Tim Smart was Keogh's former colleague at ZAGG before he went to another mobile accessories company called Strax.[20] Keogh testified that he was not seeking a job at this time and that he was joking with his wife about going to work for Smart,[21] but the contemporaneous communications suggest otherwise.

---

[16] *Id.* at 204:14–205:3 (Allred).

[17] *Id.* at 205:4–9 (Allred); JX-30 (8/29/23 Teams message from Keogh to Allred asking for an update on the status of hiring a new Head of Product Development).

[18] JX-30 (8/29/23 Teams message from Keogh to Allred: "I'm more than a little disappointed over the way this has panned out."); Trial Tr. at 205:5–9 (Allred); *id.* at 48:6–14 (Keogh).

[19] JX-159 at -091.

[20] Trial Tr. at 53:14–17 (Keogh).

[21] *Id.* at 55:1–7 (Keogh); *id.* at 75:11–20 (Keogh).

## D. Keogh Downloads Documents To His Home Computer.

During the COVID-19 pandemic, Keogh began the practice of accessing his ZAGG work documents on his home computer by remapping his OneDrive.[22]  Keogh was unaware of any ZAGG policy preventing him from downloading company documents to his home computer.[23]

A new iPhone launched in September 2023, which started a new work cycle for Keogh.[24]  On September 11, 2023, the night before the iPhone launched, Keogh downloaded approximately 17,000 files from ZAGG's servers to his personal home computer.[25]  Keogh testified that this download resulted from a communication error between his computer and OneDrive.[26]  According to Keogh, he had to remap his OneDrive to access his work documents, which caused all documents in his OneDrive to download onto his home computer.[27]  Although Keogh remapped the documents on September 11, 2023, Keogh testified that the information had been available on his home computer since approximately March 2020, including from at least one prior remapping.[28]

---

[22] *Id.* at 14:11–15:10 (Keogh); Keogh Dep. Tr. at 25:6–12, 26:4–13.

[23] Trial Tr. at 16:1–3 (Keogh).

[24] *Id.* at 98:6–22 (Keogh); Keogh Dep. Tr. at 25:14–21, 154:5–13; *see also* JX-159 at -090 (8/29/23 message from Keogh to his wife sending an article titled: "Apple Sets Sept. 12 Date for Launch of iPhone 15, New Watches"); Trial Tr. at 17:15–18 (Keogh).

[25] Trial Tr. at 15:11–13, 50:23–51:5 (Keogh); *id.* at 217:11–15 (Allred); PTO ¶ 14; Keogh Dep. Tr. at 24:7–19.

[26] Trial Tr. at 15:11–17 (Keogh); Keogh Dep. Tr. at 25:14–21.

[27] Trial Tr. at 15:15–24, 51:3–5 (Keogh); Keogh Dep. Tr. at 25:14–29:4.

[28] Trial Tr. at 15:3–13 (Keogh).

The same day that Keogh downloaded the 17,000 documents, he emailed a copy of the Restrictive Covenant Agreement to Smart.[29] Keogh testified that he could not recall why he sent Smart the Restrictive Covenant Agreement, but the surrounding events indicate that Keogh was looking for new employment.[30]

### E. Keogh Starts A Job With MyCharge.

On September 19, 2023, former ZAGG CEO Chris Ahern introduced Keogh to Ron Ferber, CEO of myCharge,[31] a Michigan-based designer and distributor of portable charging solutions.[32] After their initial email correspondence, Keogh and Ferber had a Zoom call and then met in person in Michigan to discuss Keogh's potential employment.[33] Ferber inquired about Keogh's restrictive covenants and

---

[29] Trial Tr. at 53:8–13 (Keogh); JX-31 (9/11/23 email from Keogh to Smart, attaching the Restrictive Covenant Agreement).

[30] *Compare* Trial Tr. at 54:3–55:3 (Keogh), *with* JX-159 at -091 (8/29/23 message from Keogh to his wife about sending Smart a message and that he would "go" if Smart gave him "$250k, 25% Bonus, 5% 401k match and indemnification").

[31] JX-32 at -061 (9/19/23 email from Ahern connecting Keogh and Ferber); Trial Tr. at 17:21–18:10 (Keogh).

[32] myCharge – Our Story, https://mycharge.com/pages/our-story (last visited April 4, 2025).

[33] Trial Tr. at 18:11–17 (Keogh).

was hesitant to hire him.[34] So Keogh consulted an attorney,[35] and Keogh and Ferber connected their respective counsel to discuss.[36]

On October 19, 2023, Ferber sent Keogh an offer letter for a position as Chief Product Officer of myCharge,[37] and Keogh accepted.[38] Keogh submitted his letter of resignation from ZAGG on October 26, 2023. His last day was November 9, 2023.[39]

### F.    Keogh Retains ZAGG Documents.

In preparation for Keogh's departure from ZAGG, the Company's interim CFO reached out to Keogh to inquire about Company-owned equipment and property in Keogh's possession.[40] Keogh testified that he returned everything on the list provided to him by the Company that was still within his possession, but some items had been destroyed from "drop testing"—a procedure used to evaluate how a product reacts to being dropped.[41] In the midst of his departure, Keogh forgot about the ZAGG

---

[34] *See* JX-38 (10/4/23 messages between Keogh and his wife concerning Ferber and his attorney having concerns about the Restrictive Covenant Agreement); JX-43 (10/13/23 messages between Keogh and his wife about Keogh hoping to "convince Ron [Ferber] to see the light" and that Ferber wanted to "part ways").

[35] Trial Tr. at 19:12–14 (Keogh); Keogh Dep. Tr. at 194:19–195:8; *see* JX-40 (10/9/23 email exchange between Keogh and his Utah attorney).

[36] Keogh Dep. Tr. at 195:9–12; JX-40 (10/9/23 email from Keogh's Utah attorney stating that he "spoke with [Keogh's] prospective employer's attorney today"); JX-41 (10/9/23 emails between Keogh's and Ferber's attorneys); JX-123 (10/10/23 messages between Keogh and his wife about discussions between Ferber's and Keogh's attorneys).

[37] JX-45.

[38] Trial Tr. at 20:3–5 (Keogh).

[39] JX-48.

[40] JX-161 at -166.

[41] Trial Tr. at 22:11–15 (Keogh).

7

documents on his home computer from the September 11 download.[42] Keogh testified that he had not used his home computer since leaving ZAGG because myCharge gave him a laptop.[43]

In December 2023, when one of Keogh's former ZAGG colleagues called him with questions about ZAGG's business, Keogh realized that the ZAGG documents remained on his computer.[44] Keogh testified that he intended to return the documents to ZAGG, as he had done with ZAGG's electronic equipment, and planned to contact ZAGG to arrange their return.[45]

Around December 18, 2023, Allred, Allen, and Dow Shirley from ZAGG's IT department investigated Keogh's September 11 document download.[46] Shirley could not ascertain the origin and frequency of this download with certainty.[47]

### G.    ZAGG Sues Keogh And MyCharge.

Before Keogh reached out to ZAGG to return the data on his home computer, ZAGG filed this suit against Keogh and myCharge. ZAGG had been preparing for

---

[42] *Id.* at 22:16–22 (Keogh).

[43] *Id.* at 24:21–23 (Keogh).

[44] *Id.* at 24:2–20 (Keogh).

[45] *Id.* at 26:1–10 (Keogh).

[46] *See* JX-75; JX-76.

[47] *See* JX-76 at -309–10 (12/19/23 Teams messages from Shirley stating, "[t]he logs do not provide the process that initiated the download" and "I can only go back 6 months").

litigation even without knowing where Keogh was going—and, indeed, before Keogh had resigned.[48]

ZAGG asserted claims for: breach of the non-compete, non-interference, non-disparagement, and confidentiality provisions of the Restrictive Covenant Agreement; misappropriation of trade secrets; unfair competition; unjust enrichment; and tortious interference.[49]  After ZAGG filed suit, myCharge effectively cut off Keogh from its business.[50]  Keogh and myCharge answered and denied ZAGG's claims.[51]

### H.  MyCharge Fires Keogh.

On January 29, 2024, myCharge fired Keogh as part of a settlement with ZAGG.[52]  In exchange, ZAGG dismissed its claims against myCharge.[53]  In the settlement agreement with ZAGG, myCharge represented, among other things, that it did not access, review, or obtain ZAGG data or files, or solicit ZAGG employees, customers, or suppliers.[54]

---

[48] JX-46; JX-47; JX-56 (10/29/23 email from Allen informing ZAGG's IT department that there was "a decent chance of litigation" and instructing them to monitor Keogh's IT activity); *see also* Trial Tr. at 124:2–126:15 (Allen); Allen Dep. Tr. at 87:21–88:6; Allred Dep. Tr. at 97:10–12; PTO ¶ 18.

[49] Dkt. 1.

[50] Trial Tr. at 27:17–24 (Keogh).

[51] Dkts. 9, 10.

[52] JX-87; *see also* JX-120 (agreement between ZAGG and myCharge in which ZAGG agreed to dismiss myCharge from this action within three business days of myCharge providing written notice to ZAGG that Keogh no longer worked for myCharge).

[53] Dkt. 13.

[54] JX-120.

### I. Keogh Returns ZAGG Documents.

On February 5, 2024, the court entered the Joint Stipulation and Order Governing Company Documents, which required Keogh to return to ZAGG all Company Documents in his possession, custody, or control; to provide ZAGG with a computer-useable copy of the documents; and to delete the documents from his system and devices.[55] Keogh worked with counsel and Parcels to fully comply and, on February 12, 2024, provided ZAGG with an affidavit certifying compliance.[56]

### J. Keogh Waits Out His Non-Compete.

After being fired from myCharge, Keogh sought alternative employment.[57] Keogh testified that he applied to over 140 jobs, but none of his applications were successful.[58] He and his wife used their savings to pay for this lawsuit, and he went on unemployment benefits for six months.[59] They suffered from anxiety and depression and received medication and counseling.[60]

It was not entirely clear at this stage of the litigation what relief ZAGG was seeking. ZAGG slow-rolled discovery. For example, the original case schedule provided that the substantial completion deadline was June 7, 2024,[61] but the parties

---

[55] Dkt. 15.

[56] Trial Tr. at 29:10–21 (Keogh); JX-93, JX-94.

[57] JX-145 (Keogh discussing job interviews with a friend).

[58] Trial Tr. at 33:11–18 (Keogh).

[59] *Id.* at 33:19–34:3 (Keogh).

[60] *Id.* at 40:2–17 (Keogh).

[61] Dkt. 19.

did not enter a confidentiality stipulation—necessary for the exchange of confidential discovery materials—until June 14, 2024.[62] Keogh asserts that ZAGG sought to stay the litigation.[63] The parties rescheduled trial and entered an amended case schedule on September 25, 2024.[64]

### K. Keogh Accepts A Job With PanzerGlass After His Non-Compete Expires.

Instead of risking further escalation by ZAGG, Keogh sat out the remainder of his non-compete. He found a job with PanzerGlass that he started shortly after his non-compete expired.[65]

### L. ZAGG Asserts A Tolling Claim To Keep Keogh Benched.

Four days before the expiration of Keogh's non-compete, on November 5, 2024, ZAGG filed a motion for leave to amend the complaint, seeking for the first time to toll Keogh's non-compete period.[66] After Keogh opposed,[67] ZAGG withdrew its filing and stated that it would "promptly" replace the proposed amended complaint.[68] Over three weeks later, on December 6, 2024, ZAGG filed a Motion for Leave to File a

---

[62] Dkt. 24.

[63] Dkt. 96 ("Keogh's Post-Trial Answering Br.") at 13 (citing JX-118).

[64] Dkt. 27.

[65] Keogh had a meeting with PanzerGlass in November 2023. *See* JX-68. Keogh did not begin discussions about employment with PanzerGlass until much later in 2024 and did not begin working at PanzerGlass until approximately November 9, 2024. *See* JX-36; Trial Tr. at 36:10–16 (Keogh).

[66] Dkt. 35.

[67] Dkt. 40.

[68] Dkt. 44.

Verified Second Amended and Supplemental Complaint, Motion for a Preliminary Injunction, and Motion to Schedule a Preliminary Injunction and Reschedule the Current Trial Date.[69] The aim was to delay the trial (again).

**M.      PanzerGlass Fires Keogh.**

ZAGG did not rush to refile its motion for leave to amend, but it did rush to threaten Keogh's new employer. On November 19, 2024, ZAGG, through counsel that has lurked in the background throughout this case but never appeared, sent a letter threatening PanzerGlass, stating:

> In short, **Keogh's obligation not to work for any competitor in the mobile accessories market remains currently in effect**. His employment with PanzerGlass, which sells screen protection for mobile devices in direct competition with ZAGG, is therefore a breach of this obligation. Given Keogh's recent revelation that he is now working for PanzerGlass, ZAGG intends to seek leave to amend its complaint against Keogh and will seek appropriate relief from the Court.[70]

ZAGG knew this statement was false because it had just requested the court's permission to add such a tolling claim.[71] As a direct result of ZAGG's threats, PanzerGlass fired Keogh.[72] This mooted ZAGG's motion for a preliminary injunction.

**N.      The Parties Go To Trial.**

At the December 23, 2024 scheduling conference, the court ordered the parties to go forward with the January trial dates given the court's "extreme[] reticen[ce] to

---

[69] Dkt. 48.

[70] JX-108 at 1 (emphasis added).

[71] Dkt. 48.

[72] JX-74.

slow things down when doing so affects people's livelihood, or at least have that possibility[.]"[73]

On January 3, 2025, the court permitted ZAGG to amend its complaint and add a tolling claim, noting that it would be an uphill battle for ZAGG given the intuitive appeal of Keogh's position.[74] ZAGG filed its Second Amended Complaint on January 13, 2025,[75] which Keogh answered before trial. In his answer, Keogh also counterclaimed for a declaratory judgment that his non-compete expired as of November 9, 2024, and for tortious interference given ZAGG's interference with Keogh's PanzerGlass employment.[76] The court held a one-day trial on January 21, 2025.[77] The parties completed post-trial briefing on February 21, 2025.

## II. LEGAL ANALYSIS

ZAGG claims that Keogh breached the Restrictive Covenant Agreement and misappropriated ZAGG's trade secret information in violation of the Delaware Uniform Trade Secrets Act.[78] Keogh argues that the Restrictive Covenant Agreement

---

[73] JX-112 at 12–13.

[74] Dkt. 75 at 24.

[75] Dkt. 67.

[76] Dkt. 73.

[77] Dkt. 87.

[78] The Second Amended and Supplemental Verified Complaint also includes claims for unfair competition and unjust enrichment. Because ZAGG did not dedicate any time during trial or in pre- or post-trial briefing to prove these claims, it has waived them. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

13

is unenforceable and invalid, that ZAGG did not prove any of its claims of breach or misappropriation, and that Keogh is entitled to attorneys' fees and expenses.

## A. Breach Of The Restrictive Covenant Agreement

ZAGG claims that Keogh breached the agreement by: (i) engaging in Competitive Activities through his myCharge and PanzerGlass employment; (ii) engaging in Interfering Activities; (iii) disparaging ZAGG; and (iv) misusing ZAGG's confidential information. ZAGG bore the burden of proving its claim for breach of the Restrictive Covenant Agreement by a preponderance of the evidence,[79] except that ZAGG must prove its entitlement to specific performance by clear and convincing evidence.[80]

Keogh argues that the Restrictive Covenant Agreement is unenforceable and invalid because it is overbroad in geographic scope, does not protect ZAGG's legitimate business interests, and fails a balancing of the equities. Keogh also denies that he breached the terms of the Restrictive Covenant Agreement. Because ZAGG failed to prove breach, this decision skips Keogh's arguments concerning the enforceability of the agreement.

---

[79] *See S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) ("To succeed at trial, Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence." (internal quotation marks and citation omitted)).

[80] *Cirrus Hldg. Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1201–02 (Del. Ch. 2001).

14

### 1. Competitive Activities

The Restrictive Covenant Agreement prevents Keogh from competing with ZAGG (the "Non-Compete Provision").

Section 6(a) states:

> During the Non-Compete Period, I shall not, directly or indirectly, individually or on behalf of any person, company, enterprise, or entity, or as a sole proprietor, partner, shareholder, director, officer, principal, agent, or executive, or in any other capacity or relationship, engage in any Competitive Activities, within the United States or any other jurisdiction in which the Company Group is actively engaged in business.[81]

Section 6(c) defines "Competitive Activities" to mean the "design, manufacture, marketing, sales, or distribution of accessories for consumer mobile electronic devices" and "Non-Compete Period" as 12 months from the "anniversary of the date of any termination of the Employment Period."[82]

ZAGG claims that Keogh violated the Non-Compete Provision by working at myCharge and PanzerGlass during the Non-Compete Period. The Non-Compete Provision does not expressly prohibit Keogh from working for a competitor. Rather, it prevents him from "directly or indirectly . . . engaging in any Competitive Activities," which is defined to include activities involving the "design, manufacture, marketing, sales, or distribution of accessories for consumer mobile electronic

---

[81] Restrictive Covenant Agr. § 6(a).

[82] *Id.* § 6(c)(ii), (iv).

devices."[83]   ZAGG thus bore the burden of proving that Keogh engaged in these prohibited activities.

ZAGG did not prove that Keogh breached the Non-Compete Provision during the short period he worked for myCharge.  ZAGG argues that Keogh's employment at myCharge violated the Non-Compete Provision because myCharge operates in the field of "accessories for consumer mobile electronic devices"[84] and Keogh was hired as myCharge's "Chief Product Officer."[85]  ZAGG argues that Keogh must have been—even if only indirectly—engaging in Competitive Activities.  ZAGG also points to a handful of emails that Keogh had downloaded through the OneDrive mapping and then forwarded to his myCharge email account, including a November 8, 2023 email to a supplier in Hong Kong asking for information on a Kevlar phone case.[86]

None of this evidence demonstrates that Keogh engaged in Competitive Activities while working at myCharge.  ZAGG did not seek discovery from myCharge. Keogh was the only percipient witness to testify concerning his work at myCharge.

---

[83] Keogh makes a persuasive argument that the definition of "Competitive Activities" would prevent him from doing something as attenuated from ZAGG's business as working as a UPS driver or a cashier at a convenience store that sells chargers and cords (which presumably falls within the meaning of "distribut[ing]" accessories for consumer mobile electronic devices).  Keogh's Post-Trial Answering Br. at 23–24. This decision does not resolve the issue of whether ZAGG had a legitimate business interest in such restrictions.

[84] *See* JX-153 (document titled "Competitive Products" showing two myCharge products as compared to ZAGG's mophie products).

[85] Trial Tr. at 20:12–14 (Keogh).

[86] JX-134; JX-65.

According to Keogh, while at myCharge, he worked exclusively on a line of pet products that did not include any "accessor for consumer mobile electronic device."[87]

Tacitly conceding that it failed to prove actual competition, ZAGG cites to *Sorrento Therapeutics, Inc. v. Mack* to argue that taking steps to prepare a product to compete constitutes an activity indirectly competitive with ZAGG.[88] The restrictive covenant in *Sorrento*, however, restricted the defendant from "having any Relationship" in which he engages in or assists any entity "directly or indirectly" on "any activity" that is "directly or indirectly competitive" with the plaintiff's product "or any business related to" the plaintiff's product.[89] By contrast, the Non-Compete Provision does not prohibit Keogh from "having a relationship" with myCharge.

ZAGG also did not prove that Keogh violated the Non-Compete Provision by working for PanzerGlass. As support, ZAGG cites only to the fact that PanzerGlass is a competitor. ZAGG made no effort to prove that Keogh designed, manufactured, marketed, sold, or distributed accessories for consumer mobile electronic devices while employed by PanzerGlass.

Keogh is entitled to judgment in his favor on ZAGG's claims for breach of the Non-Compete Provision relating to Keogh's work for myCharge and PanzerGlass.

---

[87] Trial Tr. at 19:15–20:2, 20:18–21:12 (Keogh).

[88] Dkt. 94 ("ZAGG's Post-Trial Opening Br.") at 37 (citing *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *19 (Del. Ch. Sept. 1, 2023)).

[89] *Sorrento*, 2023 WL 5670689, at *19.

### 2. Interfering Activities

The Restrictive Covenant Agreement prevents Keogh from interfering with ZAGG's business (the "Non-Interference Provision").

Section 6(b) states, "During the Non-Interference Period, I shall not, directly or indirectly for my own account or for the account of any other individual or entity, engage in Interfering Activities."[90]

Section 6(c) defines "Interfering Activities" as

> (A) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Person employed by, or providing consulting services to, any member of the Company Group to terminate such Person's employment or services (or in the case of a consultant, materially reducing such services) with the Company Group; (B) hiring any individual who was employed by the Company Group within the six (6) month period prior to the date of such hiring; or (C) encouraging, soliciting, or inducing, or in any manner attempting to encourage, solicit, or induce, any Business Relation to cease doing business with or reduce the amount of business conducted with any member of the Company Group, or in any way interfering with the relationship between any such Business Relation and any member of the Company Group.[91]

Section 6(c) defines "Non-Interference Period" as 24 months from the "anniversary of the date of any termination of the Employment Period."[92]

ZAGG makes conclusory allegations that Keogh violated the Non-Interference Provision, arguing that Keogh must have encouraged, solicited, and induced people

---

[90] Restrictive Covenant Agr. § 6(b).

[91] *Id.* § 6(c)(iii).

[92] *Id.* § 6(c)(v).

employed by ZAGG to terminate their employment or services. ZAGG does not point to any record evidence, instead arguing that Keogh engaged in spoliation and that the court should "draw a reasonable inference these deleted communications would provide further evidence of Keogh's improper solicitation efforts."[93]

ZAGG asserts that Keogh deliberately and systematically spoliated evidence relevant to key issues and events in this litigation by deleting text messages.[94] To be entitled to such extreme sanctions, ZAGG must prove that Keogh "acted recklessly or with the intent to deprive another party of the information's use in the litigation"[95] and that ZAGG suffered prejudice.[96] "The party seeking to prove spoliation, for its part, must identify specific documents that existed and would support its position; it cannot make a vague and general complaint that evidence has been destroyed."[97]

ZAGG's argument flounders on the fact that Keogh's deletion was of zero consequence in this litigation. Keogh's counsel later recovered the automatically deleted text messages and produced them. ZAGG has not demonstrated that any

---

[93] ZAGG's Post-Trial Opening Br. at 38–39 (citing *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *17 (Del. Ch. Sept. 29, 2023)). *Gener8* is inapposite because the defendant only produced twelve text messages, and failed to produce text messages that the plaintiff otherwise acquired through discovery (and that constituted "the most damning evidence in the case" against the defendant). *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *14 (Del. Ch. Sept. 29, 2023), *judgment entered*, (Del. Ch. 2023).

[94] *Id.* at 64.

[95] *Goldstein v. Denner*, 310 A.3d 548, 583 (Del. Ch. Jan. 26, 2024) (citing Ct. Ch. R. 37(e)(2)).

[96] *Id.*

[97] *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *23 (Del. Ch. Sept. 17, 2012).

relevant WhatsApp or WeChat messages existed and that Keogh intentionally deleted them. This is not reckless behavior with an intent to deprive. There is no document that should have been preserved and produced but was destroyed. ZAGG has not suffered prejudice.[98] ZAGG has not demonstrated that sanctions or adverse inferences are warranted concerning its claims under the Non-Interference Provision or otherwise.

Keogh is entitled to judgment in his favor on ZAGG's claim to enforce the Non-Interference Provision.

### 3.    Disparagement

The Restrictive Covenant Agreement prevents Keogh from disparaging ZAGG (the "Non-Disparagement Provision").

Section 6(d) states:

> I agree that during the Employment Period, and at all time thereafter, I will not make any disparaging or defamatory comments regarding any member of the Company Group or its respective current or former directors, officers, employees or shareholders in any respect or make any comments concerning any aspect of my relationship with any member of the Company Group or any conduct or events which precipitated any termination of my employment from the Company. However, my obligations under this subsection (d) shall not apply to disclosures required by applicable law, regulation, or order of a court or governmental agency. Further, nothing in this Agreement prohibits me from speaking with law enforcement, the Equal Employment Opportunity

---

[98] Trial Tr. at 180:7–183:4 (Allen).

Commission, any state or local division of human rights or fair employment agency, or my attorney.[99]

ZAGG spent zero time addressing its disparagement claim at trial. In post-trial briefing, ZAGG cites four text messages not discussed at trial where Keogh expressed frustrations over this litigation to friends.

In a December 2023 exchange with former ZAGG team member Edward Li, Keogh described the Restrictive Covenant Agreement as "harsh."[100] When Li, who signed a similar agreement, said that no one pointed out the covenants to him, Keogh responded: "Slimy pricks."[101] That was the worst of it. The rest of the exchange includes chatter about non-competes.

In a January 2024 exchange with someone named Vince Fontaine, Keogh said that he left ZAGG "in November. Place went soooo toxic. Wouldn't wish working there on my worst enemy..New CEO a psychopath."[102]

In a February 2024 exchange with someone named Francois Gravel, Keogh informed Gravel that he was unemployed. In speaking about the CEO, Keogh states that Allen "[r]uined [Keogh's] career, hurt [his] family, and tarnished [his] reputation" and that if he "had money [he'd] counter."[103] Keogh sent Gravel the terms

---

[99] Restrictive Covenant Agr. § 6(d).

[100] JX-122.

[101] *Id.*

[102] JX-85.

[103] JX-89 at -655.

21

of the Non-Compete Provision so Gravel could "run it by a buddy of [his] which is Canada's leading labour lawyer[.]"[104]

In a February 2024 exchange with someone named Edgar Guzman, Keogh informed Guzman about the lawsuit, Keogh's termination from myCharge, and Keogh's efforts to find alternative employment.[105] Keogh criticizes Allen's strategy of "hiring big expensive guys to try to fix [mophie,]" including "2x Apple guys recently."[106] Keogh states that Allen "accused [him] of downloading files[,]" [s]pread awful rumors around CES about [Keogh] and hurt [his] reputation."[107] Keogh calls Dan "an unbelieve POS."[108]

These texts are not very nice. Nor are they terribly scandalous. Are they disparaging or defamatory? The parties did not brief the legal standard. And it does not matter because ZAGG has not identified any harm or damages resulting from Keogh's statements. ZAGG asserts that Keogh's "ongoing pattern of conduct [is] designed to damage ZAGG."[109] But ZAGG "do[es] not explain, or attempt to prove, any measure for these damages."[110]

---

[104] *Id.*

[105] JX-91 at -620.

[106] *Id.*

[107] *Id.* at -621.

[108] *Id.*

[109] ZAGG's Post-Trial Opening Br. at 39.

[110] *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216, at *39 (Del. Ch. Apr. 30, 2024).

If ZAGG seeks injunctive relief on this claim, which is unclear, under Section 9 of the Restrictive Covenant Agreement and based on ZAGG generally seeking injunctive relief for (presumably all of) Keogh's purported breaches, ZAGG "fail[s] to explain what form this would take."[111] ZAGG articulates no basis on which it has been damaged by Keogh's conduct or will suffer irreparable harm. Indeed, ZAGG's CEO could not identify any lost business, customers, or employees as a result of Keogh's conduct, including because ZAGG did not seek discovery on this issue.[112]

ZAGG has failed to prove its claim for breach of the Non-Disparagement Provision.

### 4. Confidential Information

The Restrictive Covenant Agreement restricts Keogh's use of confidential information and requires Keogh to return confidential information on the termination of his employment (the "Confidentiality Provisions").[113]

---

[111] *Id.* The cases on which ZAGG relies in support of its argument that Keogh contractually stipulated that ZAGG would be irreparably harmed in the event of breach do not involve non-disparagement claims and involved stronger facts. *See Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208 (Del. 2012) (upholding the trial court's factual finding of irreparable injury based on violations of a non-disclosure agreement and a confidentiality agreement); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, 1997 WL 458494 (Del. Ch. Aug. 7, 1997) (finding irreparable harm based on a violation of a non-competition agreement, including based on the factual record). Furthermore, because Section 9 references only the Non-Compete and Non-Interference Periods, this provision alone does not relieve ZAGG of its burden to prove the elements of the Non-Disparagement claim.

[112] Trial Tr. at 180:7–189:24 (Allen).

[113] Restrictive Covenant Agr. §§ 1(a), 3.

Section 1(a) requires that Keogh "hold in confidence, and not to use, except for the benefit of the Company Group, or to disclose to any person, firm, corporation, or other entity without prior written authorization of the Company, any Confidential Information that [he] obtain[s] or create[s]."[114]

Section 1(a) defines "Confidential Information" as "information that the Company Group has developed, acquired, created, compiled, discovered, or owned or will develop, acquire, create, compile, discover, or own, that has value in or to the business of the Company Group."[115] "Confidential Information" also includes:

> any and all non-public information that relates to the actual or anticipated business and/or products, research, or development of the Company Group, or to the Company Group's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company Group's products or services and markets, customer lists, and customers (including, but not limited to, customers of the Company Group on whom I called or with whom I may become acquainted during the Employment Period), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company Group either directly or indirectly in writing, orally, or by drawings or inspection of premises, parts, equipment, or other Company Group property.[116]

Section 3 governs "Returning Company Group Documents." Through it, Keogh agreed:

---

[114] *Id.* § 1(a).

[115] *Id.*

[116] *Id.*

that, at the time of termination of my employment with the Company for any reason, I will deliver to the Company (and will not keep in my possession, recreate, or deliver to anyone else) any and all Confidential Information, Third Party Information and all other documents, materials, information, and property developed by me pursuant to my employment or otherwise belonging to the Company and, if so requested, will certify in writing that I have fully complied with the foregoing obligation. I agree further that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to the Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide the Company with a computer-useable copy of all such Company information and then permanently delete and expunge such Company information from those systems; and I agree to provide the Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed.[117]

ZAGG claims that Keogh violated the Confidentiality Provisions by downloading documents that fit the definition of "Confidential Information" to his home computer on September 11, 2023, forwarding it to his personal and myCharge email addresses, and failing to return the documents upon his termination.

ZAGG focuses on the September 11 document remapping, but Keogh convincingly explained that at trial. Keogh explained why and how the remapping occurred, that he was not aware of it when he left ZAGG, and what he did once he realized he retained the documents.[118] There is no evidence of a policy that prevented

---

[117] *Id.* § 3.

[118] Trial Tr. at 14:11–17:1 (Keogh). ZAGG presented evidence to suggest that the download could not have been from a remapping from the Company's HR coordinator, Daniel Allred. Trial Tr. at 216:8–221:3 (Allred). But Allred is not an IT expert, and

him from downloading the documents in the first place.[119] At trial, ZAGG pointed to several ZAGG policies regarding the use of ZAGG data, but none prohibited Keogh from remapping the documents.[120] ZAGG witnesses could not say one way or another whether Keogh had ZAGG's permission to use his personal devices,[121] whether ZAGG enforces that policy,[122] or whether ZAGG tracks approvals.[123] The remapping alone did not breach the Confidentiality Provisions.

Nor is there evidence that Keogh disclosed any Confidential Information. Keogh testified that he never disclosed ZAGG confidential information to myCharge, Panzer, or anyone else.[124] In January 2024, myCharge said the same.[125]

The reality is that ZAGG did not try hard to prove its claim for breach of the Confidentiality Provisions. That is not a criticism. That was not an attorney error; ZAGG had high quality attorneys representing it. Rather, ZAGG did not try because it was a rational business decision not to bust the bank prosecuting a former employee who was waiting out his restrictive covenant period at home on unemployment. ZAGG's CEO Allen did not run from this reality in his deposition and trial

---

his testimony alone is insufficient to prove ZAGG's claim. Furthermore, messages from ZAGG's IT employee, Dow Shirley, demonstrate that the source initiation and frequency of Keogh's download were uncertain. *See* JX-76 at -309–10.

[119] Trial Tr. at 16:1–3 (Keogh); *id.* at 223:19–224:4 (Allred).

[120] *Id.* at 209:15–212:9, 223:19-224:4 (Allred).

[121] *Id.* 223:15–18 (Allred).

[122] *Id.* 227:24–229:16 (Allred).

[123] *Id.* 229:11–16 (Allred).

[124] *Id.* at 26:11–19 (Keogh).

[125] JX-120 ¶ 2(a).

testimony.[126]  Having made the rational decision not to prove an essential element of its case, it should be no surprise that ZAGG failed to meet its burden of proof.

ZAGG did not prove that Keogh breached the Confidentiality Provisions of the Restrictive Covenant Agreement.

## B.      Misappropriated Trade Secrets

Under the Delaware Uniform Trade Secrets Act, a trade secret is:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
>> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>>
>> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[127]

To prove trade secret misappropriation, the plaintiff must demonstrate that: (1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff.[128]

ZAGG fails to prove multiple elements of its trade secret misappropriation claim.  For starters, ZAGG failed to prove that the Company files Keogh possessed

---

[126] Allen Dep. Tr. at 30:18–31:10; Trial Tr. at 177:5–8, 177:14–17 (Allen).

[127] 6 *Del. C.* § 2001.

[128] *Elenza, Inc. v. Alcon Lab'ys Hldg. Corp.*, 183 A.3d 717, 721 (Del. 2018).

27

constitute protectable trade secrets. ZAGG proffers the conclusory assertion that the files at issue "represent a trove of proprietary documents" that "would be a goldmine to any ZAGG competitor[.]"[129] But Allen could not identify a trade secret in the documents Keogh had on his home computer.[130]

In its post-trial brief, ZAGG points to the Customer ASP spreadsheet as a trade secret[131] but does not explain how that spreadsheet falls within the meaning of "trade secret" under the statute. That is, ZAGG does not explain how it has "independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[.]"[132] ZAGG only points to Allen's testimony that "[n]obody outside the company would know what prices [ZAGG has] negotiated for [its] key products."[133] ZAGG could have presented an expert to elaborate on the industry standard and practice with respect to customer pricing in the consumer mobile electronic accessories industry. Allen's testimony alone is not sufficient to establish a trade secret.

ZAGG also failed to prove that the allegedly secret information was improperly used or disclosed to the injury of ZAGG. ZAGG has offered no evidence demonstrating

---

[129] ZAGG's Post-Trial Opening Br. at 52–53.

[130] Trial Tr. 176:1–177:17 (Allen); Allen Dep. Tr. at 101:12–102:6.

[131] ZAGG's Post-Trial Opening Br. at 53.

[132] 6 *Del. C.* § 2001.

[133] ZAGG's Post-Trial Opening Br. at 54.

that Keogh shared any ZAGG information with myCharge (or anyone).[134]  Instead, ZAGG asks the court to rely on "a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happen did in fact take place."[135]

The circumstantial evidence in the *Utilisave* case on which ZAGG relies was stronger than the record here.  There, the download occurred on equipment that was the property of another competitor business.  Here, the download occurred on Keogh's home computer while he was still employed by ZAGG (and ZAGG has not offered sufficient evidence that the Company prohibited home computer use).  As another example, the plaintiffs hired a forensic IT specialist to delete information from the competitor company computer and see if any copies were made.  Here, ZAGG made no efforts to see if any copies were made of the downloaded information.  Last, the court found the defendant's testimony concerning the download not credible because it was refuted by more credible testimony.  As explained above, that is not the case here.

To save its trade secret misappropriation claim, ZAGG again asserts that Keogh engaged in spoliation and the court should infer the deleted communications would have provided incriminating evidence.[136]  But Keogh explained his practice of deleting iPhone messages (but not from his iCloud) and is unaware of any relevant

---

[134] Trial Tr. at 26:11–19 (Keogh); *id.* at 173:8–177:2 (Allen).

[135] ZAGG's Post-Trial Opening Br. at 55 (quoting *Utilisave, LLC v. Khenin*, 2015 WL 4920078, at *11 (Del. Ch. Aug. 18, 2015)).

[136] ZAGG's Post-Trial Opening Br. at 57–58.

messages that were permanently deleted and not recoverable.[137]  And ZAGG has not put forth any evidence disproving that explanation.  In fact, there is evidence that ZAGG engaged in deletion of relevant discovery materials.[138]  The court denies ZAGG's request to make reasonable inferences that incriminating evidence exists, particularly where ZAGG made little to no effort to seek discovery to prove its claims.

ZAGG has failed to prove its trade secret misappropriation claim.

## C.    Attorneys' Fees

Both sides seek their attorneys' fees.  ZAGG seeks attorneys' fees under 6 *Del. C.* § 2004 in connection with its trade secret claims.  Because ZAGG did not prove that claim, ZAGG is not entitled to fees.  Keogh also seeks attorneys' fees under 6 *Del. C.* § 2004, arguing that ZAGG litigated the trade secret misappropriation claim in bad faith.[139]  Keogh also argues that he is entitled to attorneys' fees under the bad-faith exception to the American Rule.[140]

---

[137] Trial Tr. at 99:1–20 (Keogh) (testifying about JX-26, a text message between Allen and John Habbouch, ZAGG's former CFO, containing a Teams message that ZAGG did not produce stating, "We had Dermot terminated from MyCharge, and everyone in the industry knows that, so we've shown that we are serious about protecting our business. But at what point will our customers feel that the things we are doing have shifted from simply protecting our business to us trying to destroy someone's livelihood[?]").

[138] *Id.* at 153:2–156:2 (Allen).

[139] Keogh's Post-Trial Answering Br. at 54–57 (citing 6 *Del. C.* § 2004).

[140] *Id.* at 57–59.  Delaware follows the "American Rule," which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation.  *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citing *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1043 (Del. 1996)).

Both of Keogh's arguments ask the court to determine whether ZAGG litigated in bad faith, so the following analysis addresses both arguments. There is no single, comprehensive definition of "bad faith," but courts have previously awarded attorneys' fees where "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[141] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[142]

ZAGG failed to prove its claims.[143] And ZAGG did not put much effort in trying to prove its claims. But ZAGG's litigation conduct did not rise to the level of bad faith necessary to support fee shifting.

## III.    CONCLUSION

For the foregoing reasons, judgment is entered in favor of Keogh. Counsel shall submit a form of order implementing this decision within one week. Keogh seeks permission to proceed with his tortious interference claim at a later stage in this action or through another action.[144] In connection with submitting a form of order implementing this decision, counsel shall submit their positions on Keogh's outstanding tortious interference claim within one week.

---

[141] *Montgomery*, 880 A.2d at 227 (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[142] *Id.*

[143] Because ZAGG failed to prove that Keogh breached the Restrictive Covenant Agreement, ZAGG's tolling arguments are moot.

[144] Keogh's Answering Br. at 58.