# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EDWARD SCOT HUSBANDS,     )
     )
     Plaintiff,     )
     )
     v.     )     C.A. No. 2023-1134-BWD
     )
DWIGHT ALEXANDER HAMILTON     )
and SHIRLEY ZEBOVITZ,     )
     )
     Defendants.     )

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: April 24, 2026
Date Decided: May 29, 2026

Dean A. Campbell, LAW OFFICE OF DEAN A. CAMPBELL, P.A., Milton, DE; *Attorneys for Plaintiff Edward Scot Husbands*.

Angelica M. Mamani, HUDSON, JONES, JAYWORK & FISHER, LLC, Dover, DE; *Attorneys for Defendants Dwight Alexander Hamilton and Shirley Zebovitz*.

**DAVID, V.C.**

Edward Scot Husbands and Dwight Alexander Hamilton had been friends on and off for more than four decades when Husbands was charged with a crime involving minors, lost his job as an assistant principal, and was required to refinance or sell his home under a divorce settlement.

Husbands received an offer from third party buyers to purchase his home for $350,000, conditioned on a home inspection. When the inspection revealed a need for costly repairs that Husbands could not afford, Hamilton, who owned a construction business through which he flipped houses, offered to purchase the home "as an investment property," rent it back to Husbands while he made the repairs, sell the home in "2-3 years," and repay Husbands "$200k (or more)" in equity from the proceeds. When the third-party buyers came back with an unconditional offer, Husbands accepted Hamilton's proposal instead. Hamilton and his wife purchased the home for $130,000, roughly the balance due on Husbands' mortgage.

Hamilton and his wife sold the property three years later for $557,000. Hamilton refused to pay Husbands his portion of the proceeds, however, asserting that the parties never reached a binding agreement requiring the payment and that repairs had cost him more than he expected. This post-trial decision rejects Hamilton's position, concluding from a series of text messages and the parties' subsequent conduct that they formed a binding contract under which Husbands is entitled to $200,000 from the sale proceeds.

# I. BACKGROUND

The following facts are as the Court finds them following a two-day trial held on December 22 and 23, 2025.[1]

### A. Husbands Agrees In A Divorce Settlement To Refinance Or Sell The Property.

Plaintiff Edward Scot Husbands and defendant Dwight Alexander Hamilton were friends for 45 years.[2] They went to school together, attended one another's first weddings, grew apart, then reconnected at various stages of their friendship.[3] In 2015, Husbands worked as a high school assistant principal in Milford, Delaware.[4] Hamilton was a licensed realtor and owned a construction business that operated in Maryland, Virginia, and Washington, D.C. through which he "flipped" residential properties.[5]

---

[1] The joint Pretrial Stipulation is cited as "PTO ¶ __". *See* Dkt. 64. The trial transcript is cited as "Tr. (Witness) at __". *See* Dkts. 74–75. Joint exhibits are cited as "JX __" unless otherwise defined.

[2] Tr. (Husbands) at 17:18–18:11.

[3] *Id.* at 19:23–20:1, 119:3–20; *id.* (Hamilton) at 351:18–24.

[4] Tr. (Husbands) at 9:10–17.

[5] PTO ¶ 2.11; Tr. (Hamilton) at 348:13–349:2, 349:9–18, 368:8–13. Hamilton has since moved to Florida. *Id.* at 348:18–21.

Husbands and Hamilton reconnected during a low point in Husbands' life.[6] In 2016, Husbands lost his job after he was charged with a crime involving minors.[7] Husbands and his wife then divorced.[8] In 2017, Husbands and his ex-wife executed a property settlement agreement under which they agreed Husbands would keep their single-family residence at 404 Hudson Street in Milton, Delaware (the "Property") if he "refinance[ed] said residence, removing [his ex-wife's] name from all debt obligations associated with said home;" otherwise, the Property would "be sold through a realtor of the parties' mutual choosing."[9]

By late 2019, it became clear that Husbands could not qualify for a loan and would have to sell the Property to comply with his divorce agreement.[10] Husbands was overwhelmed by the prospect of selling the Property and Hamilton stepped in to help him, insisting that "[y]ou don't need a lawyer" for a "simple [property] listing agreement."[11] On Hamilton's advice, Husbands hired Melissa Squier as his realtor.[12] Hamilton also advised Husbands about necessary repairs to the Property, including

---

[6] Tr. (Husbands) at 18:3–23; *id.* (Hamilton) at 351:14–24, 353:8–13.

[7] JX 1 at 16; Tr. (Husbands) at 14:5–22, 28:16–24, 130:16–24.

[8] Tr. (Husbands) at 11:4–7.

[9] PTO ¶ 2.2; JX 2 at ¶¶ 2(a)–(c).

[10] JX 1 at 5, 9–10, 30; *see* JX 3; Tr. (Husbands) at 16:13–22, 24:7–25:2.

[11] JX 1 at 39.

[12] *Id.* at 41; JX 3 at 4; Tr. (Husbands) at 36:9–13.

to address water damage and foundation issues,[13] and in several instances sent employees to make repairs to the Property.[14]

### B. Third-Party Buyers Offer To Purchase The Property But A Home Inspection Reveals Costly Repairs.

On November 1, 2020, Husbands received an offer from third-party buyers (the "Buyers") to purchase the Property for $350,000, conditioned on a home inspection.[15]

On November 10, Squier told Husbands that the home inspection had revealed problems with the Property's foundation that required repairs.[16] The Buyers received a quote from a vendor who could make the necessary repairs for between

---

[13] JX 1 at 69 ("My guy is coming over tomorrow to fix the foundation"); *id.* at 76 ("Water is getting into the block in the basement and salt is coming through."); Tr. (Husbands) at 44:21–45:5, 51:4–8, 52:17–53:5; *id.* (Hamilton) at 372:17–20.

[14] *See* JX 1 at 43–44 (discussing septic repairs); *id.* at 46 ("My guys almost finished today . . . . I don't have any other things for them and they're all yours next week."); *id.* at 52 ("Is the [water heater] leaking?? Just listened to your voice mail. Gotta shut this down and call a plumber. That's gotta be replaced ASAP."); *id.* at 61 (discussing where and how to paint with drylock around the "dampest places"); *id.* at 67 ("[Husbands' daughter] also sent me pics of the foundation repairs. I'll send someone over Friday to make that happen."); *id.* at 76 ("Water is getting into the block in the basement and salt is coming through . . . . For the water in the basement you need to make sure the downspouts are draining away from the house. That's the #1 reason water gets in."); *id.* at 77 ("My advice would be to offer an allowance of $5000 for flooring."); *id.* at 83 ("My front door is too messed up for a simple fix . . . would have to be completely taken out because of the glass on the sides . . . ."); *see also* Tr. (Husbands) at 42:21–43:5; *id.* (Squier) at 312:13–20.

[15] JX 1 at 84; JX 6 at 18.

[16] JX 1 at 88; JX 6 at 25.

$15,000 and $20,000, but Husbands could not afford the repairs at that price.[17]

Hamilton offered to send his own employees to make the repairs instead.[18]   On

November 23, Husbands instructed Squier to inform the Buyers that they had until

8 p.m. that evening to decide whether to move forward with the sale.[19]

### C.    Hamilton Offers To Buy The Property And Husbands Terminates His Realtor.

Later that evening,[20] Hamilton emerged with a compromise, proposing over

text message that Husbands sell the Property to Hamilton and his wife, Shirley

(together, "Defendants") instead of the Buyers:

> Sorry to do this in a text but I wanted to let you know tonight.  Shirley and I are going to buy your house.
>
> Plan A – we as a group of three co-sign for you.  The house will be the primary residence for you.  We will put down the deposit and finance the loan.
>
> Plan B – we buy the house as an investment property.
>
> You'll pay the rent and utilities.
> The rent should be about $800 a month.
>
> 2-3 years down the road we sell the house and we'll make sure you get the $200k (or more) for your retirement fund.  You know I won't fuck you over.

---

[17] JX 1 at 93.

[18] *Id.* at 88, 93; JX 6 at 26.

[19] Tr. (Husbands) at 177:9–21; JX 6 at 34.

[20] Decisions were happening over dinner.  *See* JX 1 at 95; JX 6 at 34.

When we sell-because my name is [o]n the house I'm [l]egally able to sell it and not violate any real estate laws. So no sales commission!

If you agree we have to wait 30 days after you cancel the contract with [Squier]. You and I will go over your bank records and make sure you're up to date on any fees and fines etc.

I'm sorry I couldn't make this offer last year. We just bought a house and couldn't do it. If this sounds acceptable to you we can make plans.

I wanted to lay out the hard data. Please feel free to call and we can discuss the details.[21]

Husbands replied: "Omg!!!!! I cannot believe it. Thank you so much!! Tell Shirley I said thank you as well!!"[22]

The next day, November 24, Squier told Husbands that she was "trying to keep th[e] [deal with the Buyers] alive."[23] With Hamilton's input, Husbands prepared a proposed addendum to his sales agreement with the Buyers providing that Husbands would "fix the foundation per the engineering report at [Husbands'] expense," pay for a Delaware engineering firm to conduct a new inspection, provide a "satisfactory water analysis" from the Property's well, and add drainage near the Property's front steps (the "Addendum").[24] When discussing the Addendum,

---

[21] JX 1 at 96.

[22] *Id.*

[23] JX 1 at 98; JX 6 at 34.

[24] JX 24; *see* JX 1 at 99; JX 6 at 34; Tr. (Husbands) at 183:21–184:1. Husbands saw his future drip, dripping down the drain, put a pencil to his temple, connected it to his brain, and he wrote his first—Addendum.

6

Hamilton told Husbands: "[s]elling the house is good for sure. But Shirley still really wants to do the Plan B. So at this point if the [B]uyers give us any shit we can simply say no thanks and move on."[25] Husbands responded: "I agree! I love Plan B."[26] Hamilton encouraged Husbands to "[g]o ahead and sign" the Addendum but assured Husbands that "if [the Buyers] don't sign that [A]ddendum today I'm 100% fine."[27] Squier sent the Buyers the Addendum but they did not sign it.[28]

Husbands then drafted a note terminating Squier as his realtor and shared it with Hamilton. Hamilton responded, "[t]hat's very good. Go ahead and send that."[29] Husbands did so on November 24.[30] On November 27, Squier relayed a new offer from the Buyers to purchase the Property for $350,000, which was not conditioned on making repairs.[31] Instead of responding to the Buyers' revised offer, Husbands proceeded to cancel his listing agreement with Squier, effective November 28, in favor of his agreement with Hamilton.[32]

---

[25] JX 1 at 98.

[26] *Id.*

[27] *Id.* at 99.

[28] Tr. (Husbands) at 289:16–23; JX 6 at 34; JX 24.

[29] JX 1 at 99.

[30] JX 6 at 34.

[31] *Id.* at 35.

[32] Tr. (Husbands) at 67:5–10; JX 7. Squier signed a document canceling the listing agreement on November 27; Husbands and his ex-wife signed it on December 1. JX 7.

### D. Husbands Sells The Property To Defendants.

Between Friday, November 27, and Monday, November 30,[33] Hamilton completed a loan application and also prepared a draft sales agreement and lease for the Property.[34] In the same time frame or shortly thereafter, while beginning the process to pay off Husbands' mortgage, Hamilton told Husbands that "Shirley and I are still good to go for buying the house. [But] [i]f a refi with us co-signing can be done that's actually better for you."[35] Ultimately the parties concluded that refinancing would not satisfy the terms of Husbands' divorce settlement and agreed to move forward with the sale.[36]

Solving one problem with another, on December 5, Husbands and Defendants executed a Contract of Purchase and Sale (the "Sales Agreement") under which Husbands agreed to sell, and Defendants agreed to purchase, the Property for

---

[33] *See* JX 1 at 101 ("Happy Thanksgiving!"); *id.* ("[B]y Monday or Tuesday we'll probably have conditional loan approval and set up the closing dates."); *id.* at 103 ("11/30/20[.]").

[34] *Id.* at 99 ("I'll be filling out our bank loan app tomorrow morning."); *id.* at 100 ("Started the online application this morning."); *id.* at 101 ("Gonna need to [put] a rental lease agreement in place for the paperwork too . . . . Shouldn't take more than a week or so to get our loan and we can sign the papers."); *id.* ("I need your bank info, loan number and a payoff amount . . . ."); *id.* at 102 ("I finished all of my loan paperwork yesterday . . . . And I'll call the settlement agent again to get things moving."); *id.* at 102 ("I'll get a contract from the lawyer and get the closing date locked in."); *id.* at 104 ("I heard from the lawyer today. She'll draw up the contract for the house. Might take a few weeks to get the loan and close but we will have a contract in place."); *see* Tr. (Hamilton) at 425:4–6.

[35] JX 1 at 104.

[36] *See id.*

8

$130,000, roughly the balance due on Husbands' mortgage (and substantially less than the Buyers' $350,000 offer).[37]

Paragraph 15 of the Sales Agreement states that "[t]he [Defendants] hereby acknowledge and agree that upon Closing, [Husbands] shall sell and convey to [Defendants] and the [Defendants] shall accept the Property 'AS IS' and hereby waive their right to a home inspection."[38] Paragraph 18 of the Sales Agreement states that the document "constitutes the entire agreement among the parties and may not be modified or changed except by written instrument executed by all the parties."[39] The Sales Agreement did not memorialize the parties' agreement that Husbands would receive "$200k (or more)" when Defendants "s[old] the house" in "2-3 years."[40]

Defendants settled on the Property on February 3, 2021.[41] The $130,000 purchase price was used to extinguish Husbands' mortgage on the Property.[42]

---

[37] JX 9; *see* JX 10 (showing $127,627.55 was due to Quicken Loans, LLC to pay off the existing mortgage).

[38] JX 9 ¶ 15.

[39] *Id.* ¶ 18.

[40] *Compare* JX 1 at 96, *with* JX 9.

[41] PTO ¶ 2.4.

[42] *Id.* ¶ 2.5; JX 10 at 1.

Defendants paid $11,273.45 in closing costs.[43]    Husbands did not receive any payment from the sale.

Husbands and Defendants then entered into a lease agreement (the "Lease")[44] under which Husbands agreed to lease the Property from Defendants for a one-year period, from February 1, 2021, through February 1, 2022, for $900 per month.[45] Paragraph 27 of the Lease states: "[t]his Agreement constitutes the entire Agreement between [Defendants] and [Husbands].  No oral agreements have been entered into, and all modifications or notices shall be in writing to be valid."[46]

While Husbands continued to reside at the Property, Hamilton paid for repairs.[47]  A few months after closing, Hamilton told Husbands that he planned to refinance the Property to "take some cash out for . . . improvements."[48]  On June 22, 2021, Defendants refinanced the Property and obtained a new $233,000 mortgage to replace the existing $130,000 mortgage, withdrawing $90,576.41 in cash.[49]

---

[43] JX 10 at 1.

[44] JX 1 at 126, 130.

[45] JX 12 ¶ 1.  The exhibit submitted does not contain a signature or date of execution, but Husbands testified that he did eventually sign the Lease after living in the Property for several months while paying $900 per month in rent.  Tr. (Husbands) at 80:7–11.

[46] JX 12 ¶ 27.

[47] *See* JX 1 at 149, 153–54, 206–07, 212.

[48] JX 1 at 150.

[49] PTO ¶ 2.7; JX 14 at 3.

### E.  The Parties' Relationship Breaks Down.

After Defendants refinanced the mortgage, Husbands, past patiently waiting, asked Hamilton when he would receive his $200,000 in equity in the Property. Around the end of June, Husbands sent Hamilton a text message explaining:

> You had mentioned taking $40-50[,]000 out of the house to do repairs and you took $100,000. . . . I am getting worried because [o]ur original agreement said I was going to get the $200,000 if we sold the house in the end and you would get anything over that.  Now we are in the position of a $230,000 house.  There is no way I will get $200,000 in the end.[50]

Hamilton replied:

> You're not gonna get screwed.  I took a cash out refi and invested the money.  The extra money is earning interest right now.  Working smarter.  Not harder.  That's how I've been able to get ahead.  Making the money MAKE money for you.  That's what we're doing.  You're gonna get your cash out when we sell.[51]

Over the following months, Husbands expressed regret over selling the Property to Defendants instead of the Buyers.  Around January 2022, Husbands and Hamilton spoke on the phone,[52] after which Husbands texted: "if I was guaranteed to clear $207,000 with [Squier] who you talked me into firing . . . why would I take

---

[50] JX 1 at 158.

[51] *Id.*  He got a lot farther by working a lot harder, by being a lot smarter, by being a self-starter.

[52] *Id.* at 192 ("Got time to chat?").

$150,000 from you[?]"[53]  On February 1, Hamilton emailed Husbands, claiming Husbands would have received $151,650 from the Buyers if he had followed through with that deal.[54]

The next day, Hamilton told Husbands he was increasing his rent to $1,100 per month, and if Husbands did not like the new terms, then he could vacate the Property.[55]

**F.  Husbands Asks For A Writing Memorializing Hamilton's Agreement To Repay Husbands' Equity In The Property.**

Around this time, Hamilton told Husbands that he "really would like to have an agreement in place with you in the house.  Do you want to do this by email?"[56]

Husbands asked Hamilton for "an agreement with a minimum that I will be getting the guaranteed $200,000 or more from the house[.]"[57]  Hamilton did not respond, promising only that he would work on it "[i]n a few."[58]  A few weeks later, Husbands again insisted, "I would like an agreement please.  I would like it to say I

---

[53] *Id.*

[54] JX 17 at 1.

[55] JX 13.

[56] JX 1 at 196.

[57] *Id.* at 199.

[58] *Id.*

will receive the $200,000 that was promised me, nothing less please."[59]  Hamilton

again failed to respond.  Sometime later, Husbands followed up again, explaining:

> You said over a month ago that you would be sending me a new
> agreement in a few weekends and now you are saying you are not
> sending me one . . . .  You encouraged me to fire my realtor which I did
> under your advice, because you said I would still be getting at least the
> $200,000+ that I would have gotten if I had sold with [Squier].  [Squier]
> had a deal in place and after settlement, I would have received
> $207,000-$212,000 according to her.[60]

Hamilton replied: "I've answered your question and insistence on the agreement.

There are simply too many variables about my decision.  I won't be making any

decisions on that right now."[61]

Around March, Husbands again asked Hamilton for an agreement, and

Hamilton responded, "[t]here's no agreement.  I've told you that several times."[62]

Husbands replied, "[h]ow is there no agreement?  You said I was going to get

$200,000 when the house sold and you had me fire my realtor."[63]

---

[59] *Id.* at 201.

[60] *Id.* at 202; Tr. (Husbands) at 294:16–20.

[61] JX 1 at 202.

[62] *Id.* at 205.

[63] *Id.*

Hamilton then demanded that Husbands vacate the Property by May 31.[64] Husbands complied. After Husbands left, Defendants made additional renovations to the Property. On September 7, 2023, Defendants took out a second mortgage on the Property, withdrawing $72,339.58 of the home equity in cash.[65]

### G. Hamilton Lists The Property For Sale And Husbands Files This Action.

Toward the end of September, Hamilton listed the Property for sale for $699,900.[66] When Husbands saw the listing, he once again asked Hamilton to confirm that Husbands would receive $200,000 from the sale of the Property.[67] Hamilton did not respond, and instead asked another person to contact Husbands to tell him to stop contacting Hamilton and not to interfere with the sale.[68]

On November 8, Husbands initiated this action through the filing of a Complaint Seeking Imposition of Equitable Trust for Breach of Fiduciary Duty.[69]

---

[64] *Id.* Hamilton also sent Husbands an email on March 8 telling him to vacate the Property within 30 days. JX 16A.

[65] PTO ¶ 2.7; JX 15 at 1.

[66] JX 20 at 3.

[67] JX 1 at 213.

[68] JX 21.

[69] Compl. Seeking Imposition of Equitable Tr. for Breach of Fiduciary Duty, Dkt. 1.

On November 14, Husbands filed a *lis pendens* against the Property with the Office of the Recorder of Deeds for Sussex County.[70]

On January 5, 2024, Defendants sold the Property for $557,000.[71] The same day, Husbands and Defendants entered into an Escrow Agreement under which Defendants' real estate attorneys agreed to hold $198,000 from the sale proceeds in escrow pending resolution of this action.[72] After accounting for the escrow withholding, mortgage payoffs, closing costs, and taxes and fees, Defendants received $230.26 at closing.[73]

### H. Procedural History

Husbands filed the operative Amended Complaint on January 5, 2024.[74] The Amended Complaint alleges five counts. Count I alleges a claim against Hamilton for breach of fiduciary duty based on the parties' longstanding friendship.[75] Count II alleges a claim for constructive fraud.[76] Count III alleges a claim against

---

[70] PTO at 4; JX 23 at 1; Office of the Recorder of Deeds in and for Sussex County, Delaware, Mortgage Book 22083, Page 150.

[71] PTO ¶ 2.8.

[72] JX 23 at 1–2.

[73] JX 22.

[74] Am. Compl. Seeking Imposition of Equitable Tr. for Breach of Fiduciary Duty [hereinafter Am. Compl.], Dkt. 6.

[75] *Id.* ¶¶ 22–30.

[76] *Id.* ¶¶ 31–35.

Defendants for breach of contract.[77] Count IV alleges a claim against Hamilton's wife, Shirley Zebovitz, for aiding and abetting breach of fiduciary duty.[78] Count V sought the imposition of an equitable trust over the Property, which request was mooted when the parties agreed to hold the sale proceeds in escrow.

The Court held a two-day trial on December 22 and 23, 2025.[79] Post-trial briefing concluded on April 24, 2026.[80] Oral argument is unnecessary.

## II. ANALYSIS

The parties proceeded to trial on Husbands' claims for breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraud. As set forth below, Husbands prevailed on his claim for breach of contract, and the Court therefore does not reach his alternative claims.

### A. Husbands Proved His Claim For Breach Of Contract.

"Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018) (citing *VLIW Tech., LLC v. Hewlett-Packard*

---

[77] *Id.* ¶¶ 36–39.

[78] *Id.* ¶¶ 40–44.

[79] Dkt. 72.

[80] *See* Pl.'s Post-Trial Opening Br. [hereinafter POB], Dkt. 78; Defs.' Post-Trial Answering Br. [hereinafter AB], Dkt. 81; Pl.'s Post-Trial Reply Br., Dkt. 83.

*Co.*, 840 A.2d 606, 612 (Del. 2003)). Husbands "bears the burden of proof as to his entitlement to relief by a preponderance of the evidence." *Klein v. Sussman*, 2024 WL 339339, at *6 (Del. Ch. Jan. 30, 2024). Husbands met his evidentiary burden to prove each element of his claim for breach of contract.

### 1. Existence Of An Enforceable Contract

As detailed above, at trial, Husbands proved that through text messages and other conduct, the parties reached a binding contract under which Defendants agreed to purchase the Property from Husbands as an "investment property," pay off the balance on the mortgage, rent the Property back to Husbands while Defendants made improvements to the Property, relist the Property for sale, and then repay Husbands at least $200,000 from the proceeds of the sale (the "Contract").[81]

Defendants argue that the parties never reached a binding agreement. The record evidence proves otherwise. "[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Defendants do not contest that the Contract was supported with consideration, but argue that (1) the parties did not intend to be bound by the Contract and (2) the terms of the Contract are not

---

[81] Tr. (Husbands) at 78:12–79:16, 221:1–7.

17

sufficiently definite to be enforced. They further argue that integration clauses in the Sales Agreement and Lease foreclose the Contract. Each of these arguments fails.

### a. Intent To Be Bound

The parties' communications and conduct demonstrate an intent to be bound by the Contract. When analyzing whether "parties intended that [a] contract would bind them,"[82] Delaware courts look to "overt manifestation[s] of assent—not subjective intent[.]" *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sep. 30, 2014). Objective manifestations of assent include "evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions[.]" *Eagle Force*, 187 A.3d at 1229–30. "[S]ubsequent conduct" may also demonstrate the parties' intent to be bound. *Klein*, 2024 WL 339339, at *8; *see also Goode v. Goode*, 2025 WL 3204047, at *9 (Del. Nov. 17, 2025) (affirming a finding that "parties overtly manifested an intent to be bound by . . . their subsequent conduct").

---

[82] "The first prong of *Osborn* is whether 'the parties intended that the contract would bind them,'" *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018), which requires finding the "[a]cceptance of an offer . . . , since it takes two to make a bargain." *Id.* at 1229 n.142 (quoting 2 Richard A. Lord & Samuel Williston, *Williston on Contracts* § 6:1 (4th ed.)).

The parties' text messages exchanged on November 23, 2020, reflect Defendants' offer to purchase the Property "as an investment property," permit Husbands to remain at the Property while "pay[ing] rent and utilities," "sell the house" in "2-3 years," and repay Husbands "$200k (or more)" from the proceeds.[83] The same text messages show Husbands' enthusiastic acceptance of that offer.[84]

Defendants claim that "[t]he text messages unequivocally show that [Hamilton] did not intend to be bound in that moment."[85] They point out that even after Husbands accepted Hamilton's offer, Hamilton encouraged Husbands to send the Addendum to the Buyers.[86] Hamilton's willingness to terminate the Contract if Husbands preferred to reengage with the Buyers does not undermine Hamilton's intent to be bound at the time the parties exchanged the text messages. And the parties' subsequent conduct demonstrates the opposite: that both parties intended to be bound by, and acted in accordance with the terms of, the Contract. Hamilton moved forward with loan paperwork to pay off the mortgage on the Property,

---

[83] JX 1 at 96.

[84] *Id.* Hamilton claims that he did not view this as an offer, but a "framework, the beginning of a plan." Tr. (Hamilton) at 365:7–14. "To determine whether a contract was formed, the court must examine the parties' objective manifestation of assent, not their subjective understanding." *Trexler v. Billingsley*, 2017 WL 2665059, at *3 (Del. June 21, 2017). The parties' text messages and subsequent conduct carrying out the "plan" are objective manifestations of their intent to be bound by the Contract.

[85] AB at 18.

[86] *Id.* at 19.

purchased the Property for the balance due on the mortgage, rented the Property to Husbands, conducted repairs on the Property, and never seriously denied that the parties at one time agreed Husbands would receive his equity from a sale of the Property.

#### b. Sufficiently Definite Terms

Defendants next argue that the Contract "lack[s] sufficiently definite terms to form a contract."[87] "[T]erms are sufficiently definite if they 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Eagle Force*, 187 A.3d at 1232. "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do." *Id.* "[I]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." *Id.*

The parties' text messages and subsequent written agreements provide all necessary terms of the Contract, and Defendants have not identified any terms—material or not—that the parties failed to address. Instead, Defendants argue that

---

[87] *Id.* at 17.

when the parties exchanged text messages on November 23, they had not yet agreed on the terms of the lease under which Husbands would rent the Property back from Defendants or the "final price" Defendants would pay to purchase the Property.[88]

The November 23 text messages include sufficiently definite terms to enforce. Those messages reflect the parties' agreement that Defendants would "buy the [Property] as an investment property," Husbands would remain at the Property and "pay the rent and utilities," then Defendants would sell the Property in "2-3 years," at which time Defendants would repay Husbands "$200k (or more)" from the proceeds of the sale.[89] Those terms alone provide a clear basis for determining the existence of a breach and the appropriate remedy. But even if Defendants were correct that rent and price were material terms, it is undisputed that the parties entered written agreements addressing those issues shortly thereafter: the Lease addressed rental terms and the Sales Agreement set the purchase price for the Property consistent with the mortgage payoff. As a result, the Court need not supply any terms to enforce the Contract.

Defendants also seem to argue that the parties failed to reach agreement on how Defendants would recover the cost of improvements to the Property and suggest

---

[88] AB at 21–22.

[89] JX 1 at 96.

this was a material term the Contract failed to include.[90]  But the parties' text messages do address this issue.  Defendants agreed to "buy the [Property] as an investment property," meaning they would bear the cost of repairs and receive the upside (if any) from a sale after repaying Husbands "$200k (or more)."[91]  Again, those terms are sufficiently definite to enforce.

### c.  Integration Clauses In The Sales Agreement And Lease Do Not Foreclose The Contract.

Defendants also argue that integration clauses in the Sales Agreement and Lease foreclose the Contract.  "A fully integrated, binding contract 'discharges prior agreements to the extent that they are within its scope.'" *Techno-X USA Inc. v. Spartan Forge LLC*, 2025 WL 1625387, at *5 (Del. Ch. June 9, 2025) (quoting Restatement (Second) of Contracts § 213(2) (1981)).  If a term in a prior contract "addresses a subject outside the [subsequent integrated agreement], it may survive." *Id.* at *6.

The Contract does not fall within the scope of either integration clause.  Both the Sales Agreement and the Lease state that those respective agreements constitute

---

[90] *See* AB at 24–49.

[91] Tr. (Husbands) at 221:4–7 ("I didn't care if he made 500,000 himself on [the sale of the Property] or if he made a penny.  I was still promised the 200,000."); *id.* (Hamilton) at 349:11–350:2 (explaining that while flipping houses, Defendants would seek to profit from "neglected house[s] in a good market" by purchasing the property, living in it, "do[ing] renovations," then selling it for a "strong return of investment").  When you got skin in the game, you stay in the game.  But you don't get a win unless you play in the game.

"the entire [a]greement between the parties," but the Sales Agreement only addresses Defendants' agreement to purchase the Property in December 2020, while the Lease addresses only Husbands' lease of the Property from February 2021 through May 2022.[92] Neither agreement can reasonably be read to extinguish Defendants' agreement to pay Husbands "$200k (or more)" from the proceeds of a sale years "down the road."

### 2. Breach And Damages

The record evidence demonstrates that Defendants breached the Contract. Defendants agreed under the Contract to pay Husbands "$200k (or more)" after selling the Property. They sold the Property in January 2024, but have refused to make the required payment.[93] Their refusal to do so constitutes a breach.

As a remedy for Defendants' breach, Husbands seeks a monetary award of $200,000, plus prejudgment interest. He has established his entitlement to such relief. Husbands is entitled to a payment of $200,000 under the Contract. Further, "[i]n Delaware, prejudgment interest is awarded as a matter of right." *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citing *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209 (Del. 1978)). "When the obligation to make a

---

[92] JX 9 ¶ 18; JX 12 ¶ 27.
[93] JX 19; JX 22.

23

payment arises from a contract, the court will look to the contract itself to determine when interest should begin to accrue." *Wilm. Tr., Nat'l Ass'n v. Sun Life Assurance Co. of Can.*, 294 A.3d 1062, 1078 (Del. 2023), as revised (Mar. 21, 2023). The Contract required Defendants to pay Husbands "$200k (or more)" when Defendants "s[old] the house." Husbands is entitled to prejudgment interest beginning January 5, 2024, when the sale of the Property closed.[94]

### B. Equity Does Not Require Reimbursement Of Defendants' Renovation Expenses.

Defendants argue that the Court should decline to enforce the Contract as a matter of equity because Defendants incurred unexpected expenses in repairing the Property.[95] The record shows Hamilton was familiar with and had ample opportunity to inspect the Property before purchasing it.[96] The Sales Agreement acknowledged Defendants purchased the Property "AS IS," waiving any home inspection,[97] and nothing in the record suggests the parties ever agreed Husbands would be entitled to a payment of less than $200,000 if repairs to the Property were more costly than Hamilton anticipated.

---

[94] JX 22.

[95] AB at 49–52.

[96] *See supra* notes 13–14.

[97] JX 9 ¶ 15.

At trial, Defendants introduced evidence to support a claim that they incurred $234,721 in expenses from renovating the Property.[98] They claim that after paying those expenses, plus $130,000 to satisfy the mortgage and $11,273.45 in closing costs, they will suffer a loss if they are also required to pay $200,000 to Husbands. Defendants' purported expenditures are grossly inflated,[99] and their totals also ignore their withdrawals of $160,000 through two refinancings and rent received over sixteen months.

In any event, Defendants agreed to purchase the Property as an "investment" and to repay Husbands "$200k (or more)" in equity—under that arrangement, Defendants bore the risk but also stood to earn a greater reward if the Property sold at a higher price. "[T]here is nothing inequitable in enforcing [that] contractual bargain." *See LPPAS Representative, LLC v. ATH Hldg. Co., LLC*, 2020 WL 7706937, at *10 (Del. Ch. Dec. 29, 2020). It would, on the other hand, be grossly unfair to rewrite the parties' bargain in the manner Defendants seek. Husbands could have sold the Property to the Buyers for $350,000 but transferred it to Defendants for $130,000 instead. When Husbands made that choice, he was not throwing away

---

[98] AB at 26; *but see* Book 3 Exs. at 3 (totaling $235,522 in purported expenses).

[99] For instance, Defendants brought out-of-state employees to Delaware to conduct repairs that could have been made locally, and now seek reimbursement for their gas, meals, and lodging. *See, e.g.*, Book 3 Exs. at 25 (showing charges for "Hilton Hotels, DE"); *id.* at 28 (showing charges for Royal Farms and other gas stations); AB at 38–39.

his shot at recovering value for his home—he expected Defendants to follow through on their promise to repay him the equity on a later date.

### C. Husbands' Claims For Fraud And Breach Of Fiduciary Duty Are Duplicative Of His Claim For Breach Of Contract.

Because Husbands has established a breach of contract and damages resulting therefrom, the Court does not reach Husbands' remaining claims for fraud and breach of fiduciary duty. When a fiduciary duty claim is "wholly duplicative of . . . breach of contract claims" based on "the same factual predicate," the fiduciary duty claim "is not cognizable." *Capella Hldgs., LLC v. Anderson*, 2017 WL 5900077, at *8 (Del. Ch. Nov. 29, 2017). Husbands' breach of fiduciary duty claim is premised on Defendants' "repudiat[ion] of the agreement between the parties,"[100] for which Husbands seeks the same remedy as his breach of contract claim. Husbands "can only receive a single recovery." *Arxada Hldgs. NA Inc. v. Harvey*, 2026 WL 220511, at *40 (Del. Ch. Jan. 28, 2026). Similarly, Husbands' claim for fraud rests on the theory that Hamilton never intended to perform under the Contract.[101] Husbands "cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations."

---

[100] Am. Compl. ¶ 29; POB at 27–28 ("[H]is final breach [of fiduciary duty] was refusing to give [Husbands] the $200,000.00 owed from the sale of the house.").

[101] Am. Compl. ¶ 35 ("Defendants . . . had no intent to pay Husbands when the time came to sell the house."); POB at 28 ("[Hamilton] had no intention of paying [Husbands] but instead set the wheels in motion for the fraudulent scheme.").

26

*Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010). Accordingly, all remaining counts are dismissed as duplicative of Husbands' successful breach of contract claim.[102]

### D. Husbands' Request For Fee-Shifting Is Denied.

Husbands seeks an award of legal fees incurred in connection with litigating this action. "Delaware follows the 'American Rule,' under which a prevailing party generally is expected to pay its own attorney's fees and costs." *Haywood v. AmBase Corp.*, 2005 WL 2130614, at *8 (Del. Ch. Aug. 22, 2005) (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)). An exception exists in equity, however, when a party litigates in bad faith. Shifting fees for bad faith conduct is extraordinary and rare. In my view, Defendants' litigation conduct—including their filing of purportedly "frivolous motions"—does not come close to meeting that high bar. The parties will bear their own fees.

## III. CONCLUSION

Judgment is entered for Husbands on Count III of the Amended Complaint. Prejudgment interest is awarded at the legal rate, accruing from January 5, 2024. The parties are directed to submit a proposed form of order to implement this ruling.

---

[102] *See also* Pl.'s Opening Br. on Mot. for Partial Summ. J. at 2, Dkt. 14 (conceding that "a finding of breach of contract will end the case"); Proposed Order, Dkt. 14 (stating that judgment on Husbands' breach of contract claim would render "[a]ll other claims in the Amended Complaint . . . moot").